RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0194p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JAMES CRAIG CRISTINI,

　　　　　　*Petitioner-Appellee,*

　　　*v.*

KEN MCKEE,

　　　　　　*Respondent-Appellant.*

⎤
⎟
⎟
⎟
⎟
⎟
⟩
⎟
⎟
⎟
⎟
⎦

No. 06-1606

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-74483—Denise Page Hood, District Judge.

Submitted: January 31, 2008

Decided and Filed: May 22, 2008

Before: DAUGHTREY and McKEAGUE, Circuit Judges; GWIN, District Judge.*

---

**COUNSEL**

**ON BRIEF:** B. Eric Restuccia, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, APPELLATE DIVISION, Lansing, Michigan, for Respondent. James Cristini, St. Louis, Michigan, pro se.

---

**OPINION**

---

GWIN, District Judge. Respondent-Appellant Ken McKee, warden for Petitioner-Appellee James Craig Cristini, appeals an order from the district court conditionally granting Petitioner a writ of habeas corpus after finding prosecutorial misconduct. In this habeas action originally filed in the Eastern District of Michigan, Petitioner Cristini argued inter alia that the Michigan prosecutor improperly offered and argued other-acts evidence and that the prosecutor improperly commented on the credibility of defense witnesses. The district court agreed. On appeal, Warden McKee maintains that the prosecutor did not engage in misconduct and that, even if he did, the misconduct did not result in such prejudice as to warrant habeas relief.

For the reasons stated below, we **REVERSE** the district court.

---

*The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1

**I. Background**

The Michigan Court of Appeals summarized the facts in the underlying crime as follows:

Defendant's convictions arise out of the killing of James Scott Bussell, who died of blunt force injuries to his head after being repeatedly kicked by defendant in an auto body shop owned by Tayser Mona in the early morning hours of January 17, 1994. At trial, Mona was the key prosecution witness testifying pursuant to an agreement with the prosecutor following his convictions for mutilation of a dead body and habitual offender, fourth offense arising from his involvement in the incident. See People v Mona, unpublished opinion per curiam of the Court of Appeals, issued September 30, 1997 (Docket No. 188075).

According to Mona, on January 16, 1994, defendant, Mona and Bussell spent the late afternoon together at the Oakland Mall, purchasing merchandise with bad checks. Thereafter, the threesome went together in Mona's car to various places, including Mona's home. Defendant, Mona and Bussell then went to "Tycoon's," a topless bar, where they stayed until closing time. After leaving the bar, between 2:00 and 3:00 a.m. on January 17, the threesome went together in Mona's car to his collision shop located on Dequindre just north of Nine Mile to make calls to several "escort services." Mona testified that while he was on the phone, he saw Bussell stand up and push defendant. In response, defendant hit Bussell in the face, causing Bussell to fall to the floor. At that point, Mona saw defendant, who was wearing cowboy boots, repeatedly kick Bussell in the head. When Mona asked them to stop fighting, defendant ceased kicking Bussell, who was injured and lying on the floor. However, according to Mona, defendant again started kicking Bussell, about two or three times. After defendant sat down in response to Mona's request to stop hitting Bussell, defendant got up again and began kicking Bussell. Mona then went to the back of his shop to get some ice, returning with a rag with cold water on it. When Mona returned, defendant, who was standing over Bussell, told Mona that Bussell was dead. At that point, defendant again kicked Bussell very hard in the head. Subsequently, defendant asked Mona to let him use his car to move Bussell's body.

Thereafter, Mona assisted defendant in moving Bussell's body to his car and transporting the body to an alley near Seven Mile and John R in Detroit. Placing the body next to a dumpster, defendant poured lacquer thinner over the body and set it on fire. Mona and defendant then returned to the collision shop to clean up the blood stains on the floor and to destroy any evidence that might implicate them in Bussell's death. Next, Mona and defendant drove to a motel on Eight Mile and Dequindre, where they threw out a piece of carpeting that was used to wrap the deceased's body. As they drove along Eight Mile, Mona and defendant also tossed out the deceased's personal effects, bloody clothes and rags through the car window.

According to Mona, he and defendant then went to a White Castle at Eight Mile and Gratiot, where defendant bought hamburgers to bring back to the shop for a final look. Then, defendant and Mona went to the Oakland Mall to retrieve Bussell's car. Mona testified that he then followed defendant driving Bussell's car to a gasoline station on Woodward and Eleven Mile Road to buy a gas can and gasoline. According to Mona, defendant went into the station, bought the gas can and pumped the gas. After purchasing the gasoline, Mona followed defendant in Bussell's car to another location in Detroit. There, defendant poured gasoline into Bussell's car and then set it on fire.

*People v. Cristini*, 1998 Mich. App. LEXIS 1920, 1998 WL 1990510 (July 17, 1998)

Michigan brought murder and abuse-of-corpse charges against both Petitioner Cristini and Tayser Mona. After Mona's trial was severed, a Michigan jury convicted Mona of being an accessory to murder after the fact and with mutilation of Bussell's body. After being found guilty, co-defendant Mona agreed to testify against Cristini. In return for Mona's testimony, the prosecutor agreed to reduce the habitual offender charge so that Mona faced 13 - 20 years rather than a life sentence.

At trial, the prosecution offered evidence that Cristini introduced victim Bussell to Mona, who had not previously known Bussell. Defendant Cristini testified that he "grew up with Scott Bussell" and he had "hung out with Scott." The three went out together on January 16, 1994, staying out until after the bars closed, when they went to Mona's body shop, apparently to call prostitutes. After returning to that location, Mona testified that Cristini and Bussell got into an argument, that Cristini punched Bussell, knocking him down, and then continued kicking Bussell in the head while Bussell lay on the ground, causing his death.

According to the prosecution, Cristini and Mona then took Bussell's body to a location in Detroit and set it on fire with paint thinner. The prosecution also offered evidence that Cristini and Mona recovered Bussell's car, purchased gasoline at a gasoline station, and then set Bussell's vehicle on fire on a Detroit street.

In addition to Mona's testimony describing how Cristini killed Bussell, the prosecution offered testimony of a number of witnesses who corroborated Mona's testimony and identified Cristini or a person with Cristini's features as being involved with the disposition of Bussell's body. Darold Sayler, a garbage collector, testified that he saw three people in the alley in Detroit where the victim's body was found between 3:00 and 3:45 am at a distance of approximately120 to 150 feet. The three people "were all kind of like shoulder to shoulder coming around the can like they were moving something" and "they started the fire." Sayler blew his horn and two of the men ran off to a vehicle at the other end of the alley way. Another individual later found Scott Bussell's burnt body at the place where Sayler saw these two men start the fire.

A security guard at Oakland Mall, Jason Lee, testified that he saw the victim's car parked at the mall between 3:00 and 4:00 am and recorded it in his abandoned-vehicle log. Between 7:00 and 8:00 am, guard Lee noticed a second vehicle taking a place adjacent to the abandoned vehicle. He saw two white men in their mid-twenties to early thirties. One he identified as Mona, and the second man he described as having a lighter complexion,"bushy long" blonde hair, and weighing about 210 pounds. Eventually, one of the persons entered victim Bussell's blue Aries, and both vehicles drove off.

Police recovered the victim's car ten days later. It had been burned by a fire set by spreading gasoline in the car's interior. The police found two melted down plastic containers in the car.

An Amoco gas station attendant, Ramsey, testified that she recognized both Mona and Cristini as having purchased a gasoline container and gasoline from her between 7:00 and 8:00 am on the morning following Bussell's death. She described the person who purchased the gasoline as "tall and he had blond hair and it was on the back of his neck." She further testified that Mona had bought a gas container with gas from another attendant.

The other gas station attendant, Christian, testified that co-defendant Mona had purchased a small amount of gasoline from her and was accompanied by another man who had neck-length blonde hair: "He was on the lot next to the car when they were pumping the gas, and I could only see the back of his head. And he was tall and he had blonde hair and it was on the back of his neck."

She testified that it was unusual for people to buy gas containers: "Most people don't want to pay $3.29 for a gas can they only need for a few minutes." She could not identify this second man.

In addition to this testimony, the prosecution called seven witnesses who testified about prior assaults that Cristini had committed. Prior to trial, the prosecutor had filed a pre-trial notice of his intention to use this prior bad acts evidence pursuant to M.R.E. 404(b). The prosecutor had sought to use this evidence to show Cristini's *modus operandi* in committing unprovoked assaults by striking the heads of his victims with various objects. Over defense counsel's objection, the trial court ruled that evidence regarding these prior assaults could be admitted. In his opening argument, the prosecutor indicated he would not rely solely on Tayser Mona's testimony, but would also offer evidence that Cristini had a history of directing his assaults to the faces of his victims.[1] This evidence, he said, would demonstrate that the Petitioner had a "propensity" for assaulting persons, without provocation, by striking the victim's face and head with objects. The prosecution argued that this evidence would establish his identity as the killer and contradict his alibi defense.

As a defense, Cristini offered alibi testimony that he had been with Bussell and Mona on January 16, 1994, until about 10:00 pm, when he claimed Bussell and Mona dropped him off at his mother's home. He testified that he remained at his mother's home with his brother until near midnight and then left to pick up bet winnings from Bobby Rizzo. He said he then went to his brother Craig Cristini's home with some friends. He testified that he was with these friends at the time of the killing and questioned the identification testimony of certain prosecution witnesses.

Cristini presented several alibi witnesses, who claimed that he was with them from approximately 11:00 pm on the night of Bussell's murder until the next morning, when he went to his brother's car wash at 8:00 am. The prosecution attacked this testimony. For example, Craig Cristini, the defendant's brother, testified that the defendant had been with him on the night of the murder. In response, the prosecution showed that Craig Cristini knew within weeks that his brother was sought for the murder and yet never approached police to claim that defendant James Cristini had been with him on the night of the murder.[2]

With regard to alibi witness Craig Cristini, the prosecution also elicited testimony from Dawn Macro, decedent Scott Bussell's sister. Macro testified that Craig Cristini called her to see if her family had been able to locate her brother, Scott. She testified that in her conversation she asked alibi witness Craig Cristini when he last saw James Cristini before her brother's disappearance. In conflict with his alibi testimony, she testified that Craig Cristini told her that he had last seen his brother three days *before* the murder.

Cristini also called Robert Rizzo, Jr. to provide alibi testimony. Rizzo testified that he had been with defendant Cristini on the night of the murder, that Cristini had a short brush haircut at the time, and that he had never known Cristini to have long hair and a beard. Responding to this, the prosecution offered evidence that Rizzo had been questioned about the murder less than a month

---

[1] The district court noted that many of these pages were missing from the transcript provided by Respondent. The Petitioner alleged in his petition for a Writ of Habeas Corpus that the prosecutor made these remarks during opening arguments. The Respondent did not dispute this factual allegation. When a state's return to a habeas corpus petition fails to dispute the factual allegations contained within the habeas petition, it essentially admits these allegations. *Dickens v. Jones,* 203 F. Supp. 2d 354, 360 (E.D. Mich. 2002). Because Respondent-Appellant does not dispute that this comment was made by the prosecutor in his opening remarks, we accept this allegation as being true.

[2] Q.     So you knew in January that your brother was a suspect  And of course when you knew that you didn't walk, you ran to the police department and said, Hey, I have information, my brother was with me, he couldn't have done this?  Didn't you run to the police department and tell them that?

A.     No, I didn't run to them and tell them that. . . .

after its occurrence and had failed to tell the investigating police officer that Cristini had been with him on the night of the murder.

Cristini testified that he did not kill James Scott Bussell, claiming that he was elsewhere at the time of the murder. He testified to his reasons for going to Florida shortly after Bussell's murder, and further explained that he had used Mark Sawka's name when he was driving in Florida because he had outstanding traffic warrants. In response, the prosecution presented evidence that the Florida officer arrested Cristini on an arrest warrant for Mark Sawka for a probation violation, believing that Cristini was Mark Sawka, the name given by Cristini. Even after being arrested, Cristini never gave his true name. The prosecutor argued that Cristini's explanation made no sense: why would he suffer a probation violation arrest to avoid arrest for a traffic matter?

In his closing arguments, the prosecutor made the argument that "the alibi defense is a dangerous defense, it's a two-edged sword. The man lives or dies, so to speak, figuratively with an alibi defense." Recognizing this nature of an alibi defense, the prosecutor principally challenged the testimony of the alibi witnesses, focusing on their failure to come forward with their alibi defense until trial. He also contended that these alibi witnesses lied, without objection from the defense.

As to alibi witness Michael Hay, the Michigan prosecutor similarly challenged Hay's claim that he did not come forward with his alibi testimony because he did not know that James Cristini had been charged with murder. The prosecutor ridiculed this position, saying that Michael Hay admitted to speaking weekly with defendant's brother, Craig Cristini, and would have long known that James Cristini had been charged with murder. Summarizing, the prosecutor charged that Hay "is a liar." Again, Cristini's attorney made no objection.

Finally, regarding alibi witness Rizzo, the prosecutor again attacked his failure to earlier come forward with the alibi information, especially in light of his having been questioned by a police officer: "You heard from Detective Christian [that] Rizzo is a fellow who told Detective Christian February, 1994 one month after the murder [that] the last time he saw Jimmy Cristini was early January. . . He comes here before you, commits perjury, and says oh, Jimmy Cristini was with me January 16th and 17th, 1994, a whole big lie." And, again, Cristini's attorney made no objection.

The prosecutor used similar tactics in suggesting that Cristini should not be believed. Specifically, the prosecutor said that Cristini falsely used the name Sawka when stopped in Florida and continued using that name even after learning that a warrant existed for Sawka's arrest:

> But okay, so he decided -- if he decided to give a false name because he was worried about a traffic warrant [for James Cristini], there is none. There's none, it would be here. Once the officer said oh, Mr. Sawka, there is a warrant outstanding for a probation violation, he said hold everything, I'm sorry, Officer, you know, I'm a little drunk here, I don't think well, I'm tired, and look Officer, my name is really James Cristini. That's what he would have done. Why would he want to go to jail? in somebody else's name? That's ridiculous that he was wanted on a probation violation under the name of Mark Sawka, it doesn't add up. He gave the name because he killed Scott Bussell, that's a logical explanation.

Again, Cristini's attorney made no objection.

In addition to describing the alibi witnesses as liars in final argument, the prosecutor made numerous remarks regarding Cristini's prior charges and convictions for offenses involving hitting victims in the face or extinguishing cigarettes on a victim's face. The prosecutor indicated that earlier assaults upon Robert Rizzo, Jr., James Dudas, Kimberly Sellers, and Robert Plant showed an identifying *modus operandi*:

He said because that's what boxers do, they injure people. He knows that, he goes for the head, he goes for the face. That's his trademark, that's his calling card. He may as well have left a calling card saying this was done by James Cristini. I hurt people, I hit them in the face. And he also uses objects. He uses his foot, his uses a beer bottle, he uses car windshields, he uses cigarettes. He goes for your head and your face, that's what he does. And it's always unprovoked, always unprovoked.

Responding to Cristini's position that Mona had killed Bussell, the prosecutor said Cristini's leaving Michigan for Florida, Cristini's use of someone else's name, and Cristini's past assaultive behavior suggested that Cristini, not Mona, had killed Bussell:

But who has three assaultive convictions on his record involving the use of weapons or dangerous objects against the face or head of the victims? It's Cristini. The finger points towards him and him alone.

The Petitioner's conviction was affirmed on appeal. *People v. Cristini*, No. 188079, 1998 WL 1990510 (Mich.Ct.App. July 17, 1998); *remanded* 461 Mich. 907; 603 N.W. 2d 783 (1999); *reconsideration den.* 461 Mich. 907; 607 N.W. 2d 724 (2000). On remand, the Michigan Court of Appeals again affirmed the conviction. *People v. Cristini*, No. 188079, 2000 WL 33529769 (On Remand)(Mich.Ct.App. February 25, 2000); lv. den. 463 Mich. 919; 620 N.W. 2d 306 (2000). Cristini then filed an application for writ of habeas corpus in federal court. The district court dismissed the application without prejudice, because Cristini had not exhausted his claim of prosecutorial misconduct.

Cristini next filed a post-conviction motion for relief from judgment pursuant to M.C.R. 6.500, *et. seq.* The trial court denied the motion. *People v. Cristini*, No. 94-2485-FC (Macomb County Circuit Court, May 28, 2003). The Michigan Court of Appeals denied Petitioner's application for leave to appeal, but remanded the case for an evidentiary hearing on Petitioner's claim of newly discovered evidence in support of his actual innocence claim. *People v. Cristini*, No. 249256 (Mich.Ct.App. November 20, 2003). The Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not timely filed. On remand, the trial court denied the motion for a new trial, stating that the evidence of actual innocence lacked credibility. *People v. Cristini*, No. 94-2485-FC (Macomb County Circuit Court, February 5, 2004). This decision was affirmed on appeal. *People v. Cristini*, No. 255040 (Mich.Ct. App. December 16, 2004); *leave den.*, 472 Mich. 920; 696 N.W. 2d 714 (2005); *reconsideration den.* 473 Mich. 886; 699 N.W. 2d 700 (2005).

In the meantime, Cristini had renewed his pursuit of habeas relief in the Eastern District of Michigan, asserting ten grounds for relief. Without holding an evidentiary hearing, the district court conditionally granted the Petitioner habeas relief, finding three of his grounds meritorious and declining to consider his other seven claims. Specifically, the district court granted relief based on the prosecutor's introduction of evidence of prior convictions in the state's case-in-chief and the prosecutor's arguments that the Petitioner's prior convictions showed his propensity for violence. The district court further granted habeas relief after finding the prosecutor made improper remarks in his closing statements, calling several witnesses "liars" and accusing one of perjury. Respondent McKee filed a timely notice of appeal.

## II. Legal Standard

In an appeal of a §2254 habeas action, we review the district court's legal conclusions *de novo*, but will not set aside its factual findings unless they are clearly erroneous. *Dyer v. Bowlen*, 465 F.3d 280, 283-84 (6th Cir. 2006). The standard for reviewing state-court determinations on

habeas is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified at 28 U.S.C. § 2254(d).

The AEDPA provides that federal courts cannot grant a habeas petition for any claim that the state court adjudicated on the merits unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). *See also Miller v. Francis*, 269 F.3d 609, 614 (6th Cir. 2001).

The United States Supreme Court outlined the proper application of § 2254(d) in *Williams v. Taylor*, 529 U.S. 362 (2000). To justify a grant of habeas relief under the "contrary to" clause, "a federal court must find a violation of law clearly established by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision." *Miller*, 269 F.3d at 614 (internal quotations omitted) (citing *Williams*, 529 U.S. at 413). Under the "unreasonable application" clause, a federal habeas court may grant the writ "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 614 (quoting *Williams*, 529 U.S. at 412). Even if a federal court could determine that a state court incorrectly applied federal law, the court still could not grant relief unless it also finds that the state court ruling was unreasonable. *Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000).

A violation of state law is not cognizable in federal habeas corpus unless such error amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution. *Floyd v. Alexander*, 148 F.3d 615, 619, (6th Cir.), *cert. denied*, 525 U.S. 1025 (1998). We must accept as valid a state court's interpretation of the statutes and rules of practice of that state. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Moreover, the factual findings of a state court are presumed to be correct. A federal court may only diverge from a state court's factual findings if the petitioner shows by clear and convincing evidence that the findings are erroneous. *See* 28 U.S.C. § 2254(e)(1).

The AEDPA standard of review applies only to habeas claims that are "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003). "When a habeas claim is not adjudicated in state court, we apply the pre-AEDPA standard, reviewing de novo questions of law and mixed questions of law and fact." *Hargrave v. McKee*, 2007 Fed. App. 0697 (6th Cir. 2007) *citing Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).

### III. Analysis

#### A. Procedural Default

Cristini says that the Michigan prosecutor committed misconduct by using prior assaultive conduct as propensity and identification evidence. However, Cristini never made this claim to the Michigan state courts until he filed a belated motion for relief from judgment in state court. Respondent admits that he did not argue to the district court that Cristini's claim of prosecutorial misconduct was procedurally defaulted. Respondent also concedes that, as a result, we may deem this argument forfeited. *See Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005). "[P]rocedural default is normally a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter." *Trest v. Cain*, 522 U.S. 87, 89 (1997) (internal quotation marks omitted). We may consider the issue of procedural default when raised for the first time on appeal and raise the issue *sua sponte*, but this Court does not do so "as a matter of course." *Howard*, 405 F.3d at 476; *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005); *Elzy v. United States*, 205

F.3d 882, 886 (6th Cir. 2000). Here, we decline to consider procedural default for the first time on appeal.

## B. Prosecutorial Misconduct

In his post-conviction petition, before the Macomb County Circuit Court, Cristini argued that his constitutional rights had been violated by prosecutorial misconduct. That Court found that Cristini had previously raised the same issue on direct appeal and that res judicata barred him from litigating the issue again, albeit in an ineffective assistance of counsel claim:

> In reviewing the record, the Court notes that defendant already raised the following issues on appeal: prosecutorial misconduct and the trial court's alleged improper admission of evidence regarding his prior bad acts. See the Court of Appeals July 17, 1998 unpublished decision. * * * Further, defendant's assertion regarding the prosecutor's closing argument is apparently premised on the prosecutor's reference to prior bad acts evidence. As indicated above, such evidence was already addressed by the appellate court.

In its May 28, 2003 opinion, the Michigan Circuit Court denied Cristini relief on the grounds that the claim was barred by res judicata. But while Cristini had earlier raised a state-law claim that improper character evidence had been admitted, he had never directly raised this claim as a prosecutorial misconduct claim.

The Michigan Court of Appeals found error under state law in the admission of character evidence, but it also found the error to be harmless. Although we review claims not reached by state courts *de novo*, we do so because there is no disposition on the merits to review. Since the Michigan courts applied the harmless error test after finding the same underlying conduct an error, we will review that decision under §2254(d), asking whether it resulted in a decision contrary to or involving an unreasonable application of clearly established law. *See Maples v. Stegall,* 340 F.3d 433, 437 (6th Cir. 2003) (applying de novo review only where there was no state court decision on the merits); *see also Wiggins v. Smith,* 539 U.S. 510 (2003) (applying §2254(d) to the performance prong under a *Strickland* analysis but not to the prejudice prong where there was no state court decision on that issue).

Since there is no decision on the merits of whether the prosecutor committed constitutional error, this Court reviews that issue *de novo*, but it will review the harmless error analysis employed by the Michigan Court of Appeals under the deferential §2254(d) standard. We emphasize that we apply §2254(d) to the harmless error analysis because the Michigan courts reviewed the harmless error issue with regard to the same conduct at issue here. *Cf. Filiaggi v. Bagley*, 445 F.3d 851, 854 (6th Cir. 2006) (using AEDPA standard of review when the analysis bears "some similarity" to the requisite constitutional analysis). The Michigan court discussed not only the admissibility of the propensity evidence, but the prosecutor's arguments stemming from the evidence and found the error to be harmless.

This Court employs a two-part test to determine whether prosecutorial misconduct requires a new trial. *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007). "Under this approach, a court must first consider whether the prosecutor's conduct and remarks were improper," and "then consider and weigh four factors in determining whether the impropriety was flagrant and thus warrants reversal." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (*citing United States v. Carroll*, 26 F.3d 1380, 1387 (6th Cir. 1994)). Those four factors are:

> (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or

extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.

*Id.* (*citing Carroll*, 26 F.3d at 1385); *see also Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). When considering challenges to a prosecutor's statements at trial, we examine those statements within the context of the trial to determine whether they were prejudicial error. *Girts*, 501 F.3d at 759.

*1. Use of Prior Bad Acts Evidence*

The Petitioner's primary claim is that he was deprived of his constitutional right to a fair trial by the prosecutor's extensive use of Petitioner's prior behavior as character evidence to prove his propensity to commit murder. On direct appeal, the Michigan Court of Appeals held the trial court abused its discretion under Michigan evidentiary law when it admitted this evidence "because they lacked any [identifying] 'special quality or circumstance' as to be like a 'signature' of defendant." *People v. Cristini*, 1998 Mich. App. LEXIS 1920, 1998 WL 1990510 *3 (July 17, 1998), quoting *People v. VanderVliet*, 444 Mich. 52, 66, n 1; 508 N.W.2d 114 (1993).

The Michigan Court of Appeals also noted that the prosecutor's opening and closing statements "used the 'bad-acts evidence,' which went beyond the three prior assault convictions allowed by the trial court at the pre-trial motion hearing, to argue that defendant had a propensity for assaulting people and that he acted in conformity with his character by fatally assaulting Bussell." *Id.* The Michigan Court of Appeals, however, found both the trial court's error and the prosecutor's inappropriate character argument harmless.

When a prosecutor dwells on a defendant's bad character to prove that he or she committed the crime charged, we may find prosecutorial misconduct. *See, e.g., Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000); *see also Hodge v. Hurley*, 426 F.3d 368, 384 (6th Cir. 2005). In *Washington*, this court found improper the prosecutor's animated closing argument regarding the defendant's lack of work, beating of his live-in girlfriend, excessive alcohol consumption, and lack of payments on girlfriend's home, in a prosecution for criminal sexual conduct against his girlfriend's minor daughter. 228 F.3d at 700.

The Respondent argues that *Washington* and *Hurley* are not applicable to the case at bar because in this case, the prosecution had received permission to use the prior bad acts evidence before trial as relevant to establish the identity of the perpetrator. We agree. A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings. *See United States v. Chirinos*, 112 F.3d 1089, 1098 (11th Cir. 1997) (the prosecutor may make arguments based on evidence it has a *reasonable belief* will be admitted).[3] In this case, the prosecutor's use of the evidence had already been ruled acceptable by the trial judge under Rule 404(b), and he made his argument in good faith reliance on that ruling. Unless the prosecutor's argument involves comment upon evidence that the Supreme Court has ruled violative of Constitutional guarantees, the proper course of action is an appeal of the state evidentiary ruling, not an appeal based on the prosecutor's reliance on the ruling.

---

[3]We analogize to *United States v. Leon*, 468 U.S. 897 (1984). Finding reversible error for prosecutorial misconduct is designed to deter misconduct by prosecutors, not punish trial errors. Similarly, the exclusionary rule is not designed to punish judges. *Id.* at 917 ("Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them. Imposition of the exclusionary sanction is not necessary meaningfully to inform judicial officers of their errors. . . ."). If the trial court ruling was error, the proper course for a defendant is to appeal that ruling, not argue that a prosecutor who reasonably relied on the ruling committed misconduct for doing so.

Nevertheless, some of the prosecutor's opening and closing argument went beyond the bounds of the ruling that permitted other acts evidence to establish Defendant's identity. We find, however, that the Michigan Court of Appeals reasonably found that this character argument was harmless in view of the admissible evidence that established the Defendant's guilt. Recall, Defendant Cristini claimed that he had been with his brother and friends after 10:00 pm on the night of the murder until the next morning. But Mona testified that Defendant killed Bussell and then disposed of the body and Bussell's car with Mona. Very significant evidence supported this testimony. Darold Sayler, the garbage collector, testified that he saw three people in the alley in Detroit where the victim's body was found. A jury could reasonably conclude that he had seen Cristini and Mona carrying Bussell. Jason Lee testified that he saw the victim's car parked at the mall between 3:00 and 4:00 am and then saw someone with "bushy long" blonde hair and weighing about 210 pounds drive away in the car between 7:00 and 8:00 am. Perhaps most important, Amoco gas station attendant Ramsey testified that Cristini purchased gasoline to put in a gas can shortly before Bussell's car was set on fire. For these reasons, we conclude the prior bad acts evidence and the propensity arguments did not have a substantial or injurious effect on the jury's verdict.

For the reasons stated above, we find that any error in connection with the misuse of the 404(b) evidence was, at most, harmless.

*2. Arguments that the Alibi Witnesses were "Liars"*

The Petitioner-Appellee also claims that the prosecutor denied him a fair trial by arguing that several of his alibi witnesses had lied or committed perjury. As an initial matter, we note that defense counsel failed to object to these statements. Thus, any reviewing state appellate court would have considered this under a plain error standard. However, "prosecutorial misconduct may be so exceptionally flagrant that it constitutes plain error, and is grounds for reversal even if the defendant did not object to it." *Girts*, 501 F.3d at 759. Under the plain error standard, the Petitioner must demonstrate (1) error, (2) that was plain, and (3) that affects substantial rights. If all three conditions are met, we may then exercise our discretion to notice a forfeited error, but only if (4) the error seriously affected the fairness, integrity or public reputation of the judicial proceedings. *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007).

As there is no state court decision on the merits of this argument, the Court reviews the claim *de novo*, though reviewing for plain error. *See Girts*, 501 F.3d at 759. We find no error in the prosecutor's arguments, let alone plain error.

We consider the prosecutor's remarks within the context of the entire trial to determine whether any improper remarks resulted in prejudicial error. *United States v. Young*, 470 U.S. 1, 11 (1985). Prosecutors can argue the record, highlight any inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence. But, they cannot offer their opinions as to credibility of a witness or the guilt of a defendant. *See Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005). Further, they cannot discuss any purported facts not introduced into evidence. *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000).

As the Supreme Court explained in *Young*, two separate harms stem from such arguments. *Young*, 470 U.S. at 18-19. First, "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Id.* at 18. Secondly, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* at 18-19.

In this case, the prosecutor argued that Michael Hay's testimony was "unbelievable" and that "Michael is lying when he said he didn't know [that the Petitioner was charged with murder] until

suddenly he gets on the stand and is testifying . . . He is a liar . . . he is lying for a friend." He further argued that Craig Cristini's testimony "was bogus, it [the alibi] didn't even exist. He wasn't with James Cristini on [January] 16th and 17th. He did not go to the police department. . . It's a lie." Finally, he argued that Rizzo "lied to you here, he said, hey, I never signed a warrant, those charges were dismissed. He lied about that, because, you know, he signed a warrant . . . He comes before you, commits perjury, and says oh Jimmy Cristini was with me January 16th and 17th, 1994, a whole big lie." He further stated the alibi witnesses were "speaking for James Cristini, they are his agents. And when they came in and lied to you, he knows they are lying." Further, we note that he made the same statements about the Petitioner, calling him a liar multiple times.

Significant evidence offered at trial supported the prosecutor's statements. For example, Michael Hays testified that he spoke with the Defendant's brother weekly and was close to the Cristini family, yet claimed that he did not know that Cristini had been charged with murder until the day before the trial began, despite having been listed as a defense witness weeks before. The prosecution could legitimately argue that this was likely untrue. Similarly, regarding Craig Cristini, the prosecution could question his alibi testimony when he had earlier denied seeing James Cristini for days before and after the murder. Also important, the reference to the alibi witnesses as liars was but a small portion of the prosecution's final argument. Moreover, none of these comments would create an impression that the prosecutor knew of evidence not presented to the jury. *See Young*, 470 U.S. at 18. The prosecutor argued from the evidence to contend that each person's testimony should not be believed.

In *Hodge* we found that "because these statements by the prosecutor were not coupled with a more detailed analysis of the evidence actually adduced at trial, they convey[ed] an impression to the jury that they should simply trust the State's judgment that Fenn was a credible witness and that the defendant's witnesses were non-credible, if not perjurious" and concluded that this misconduct constituted reversible error. 426 F.3d at 378-79. By contrast, in this case, the prosecution's argument *was* coupled with a detailed analysis of the record. Each time the prosecutor said some witness had lied, he explained why the jury should come to that conclusion. While his repeatedly calling these witnesses "liars" was hardly praiseworthy, these comments, viewed in context, were not improper. *See also United States v. Sherrill*, 388 F.3d 535, 537 (6th Cir. 2004) (finding the comment "that man is guilty," when read in context, not improper).

We have found no constitutionally improper remarks. Even if we found the remarks improper, however, we would find the error was not sufficiently flagrant to constitute plain error. In considering whether the remarks were flagrant, we ask about the potential of the remarks to mislead the jury or prejudice the Petitioner, whether the remarks were isolated or extensive, whether they were made deliberately, and whether the case against the Petitioner was strong. *Girts*, 501 F.3d at 759.

Although the prosecutor called these witnesses "liars," this argument that they were lying was based on evidence in the record, and was not framed in such a way that would suggest the prosecutor knew of any outside evidence. His arguments focused the jury on the evidence, not the prosecutor's personal opinion. As a result, although these remarks were not isolated and were made deliberately, they had the effect of focusing the jury on the case the prosecution had made at trial to refute the petitioner's alibi defense.

Finally, as discussed above, the case against the Petitioner was strong. Three disinterested witnesses corroborated Mona's testimony, and one of those witnesses identified the Petitioner. For these reasons, we find that any error was not flagrant but was, indeed, harmless, just as the state court reasonably concluded.

**IV. Conclusion**

For the reasons stated above, we **REVERSE** the district court's judgment and **REMAND** for consideration of the Petitioner's other claims.