Alvin Lester KEY, Petitioner–
Appellant,

v.

Lloyd RAPELJE, Respondent–Appellee.

No. 14–2257.

United States Court of Appeals,
Sixth Circuit.

Dec. 9, 2015.

BEFORE: BOGGS and BATCHELDER, Circuit Judges; HUCK, District Judge.*

ALICE M. BATCHELDER, Circuit Judge.

In 2006, after a sixteen-day trial, a jury found Alvin Lester Key guilty of two counts of first-degree criminal sexual conduct involving his young daughter. In this federal habeas corpus case, Key appeals the district court's denial of the writ, claiming that his conviction was premised on prosecutorial misconduct. Finding that the decision of the Michigan Court of Appeals was not contrary to nor did it unreasonably apply clearly established Supreme Court precedent in adjudicating Key's prosecutorial-misconduct claim, we affirm.

**I.**

An information filed against Alvin Lester Key charged him with inserting his penis and finger into the complainant's vagina when she was twelve to fifteen years old. The complainant was Key's child with a woman named Cheniqua Pinder. At trial, the complainant testified that she lived with Key for most of her life.

---

* The Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

One night while the complainant was in the seventh or eighth grade, Key came into her bedroom, got into her bed, and put his penis in her vagina. Although that was the only time Key penetrated her with his penis, he on other occasions touched her breasts and buttocks and inserted his finger into her vagina. At the time, the complainant never told anyone of the abuse because there was a rule in the house that "what goes on in the house stays in the house." In June 2005, however, she finally reported the abuse to the police, with the help of Pinder.

The complainant's testimony was corroborated by a few witnesses. First, JaMichael Key, the complainant's biological brother, testified that when JaMichael was younger, Key would sometimes tell him and his brother to go outside while Key and the complainant stayed inside the house. JaMichael claimed that, although he did not actually observe Key sexually abuse anyone, he did observe Key enter his sister's bedroom, and, in the district court's words, "he knew what was going on in the household." Second, the parents of Key's wife at the time of trial, Lisa Key, claimed that the complainant and JaMichael had told them that Key was molesting the complainant. Third, a gynecologist testified that she examined the complainant in August 2005, at which time the complainant revealed that she had recently informed her mother that she had been a victim of sexual abuse. The gynecological examination returned normal results, but the gynecologist testified that these results were not inconsistent with the complainant's allegations. Finally, a police officer testified that the complainant reported to him that Key had sexually assaulted her about thirty times over a three-year period.

Although the charges related solely to Key's alleged conduct with the complainant, much of the trial focused on Key's relationship with two other young women. The prosecution sought to introduce evidence of uncharged sexual offenses against A.K. (Key's daughter with a woman named Gloria Kidd) and Y.K. (Kidd's daughter by another man). Although the trial court initially granted the prosecution's request with respect to A.K. but denied the request with respect to Y.K., it later "ruled that *any* evidence relating to the victim's delay in reporting was admissible, which allowed the prosecutor to introduce evidence regarding [Key's] conduct with both [Y.K. and A.K.] for that purpose." *People v. Key*, No. 277762, 2008 WL 3009937, at *1 (Mich.Ct.App. Aug. 5, 2008). As a result of that ruling, the prosecutor elicited evidence about both A.K. and Y.K.

Concerning A.K., Pinder testified that one day she returned home to the apartment she shared with Key to find Key and A.K. in her bedroom. She noticed that the bed sheets had wet stains on them, and that the room smelled like sex. She reported the incident to police and brought the sheet and a towel to the police station. A DNA analyst testified at trial that DNA on the bed sheet taken from Pinder's apartment matched A.K.'s DNA and that DNA on the towel matched both A.K. and Key. The bed sheet did not show any traces of semen. A.K. herself, however, testified that Key never abused her. She did not deny Pinder's finding her in the bedroom, but testified that the DNA on the bed sheet was due to the fact that she was suffering from a vaginal problem and had sat on the bed to examine herself while Key was in the bathroom. When Key exited the bathroom, she went into the bathroom to clean herself up. Although she had formerly asserted that Key had abused her, she testified that she had fabricated the story because a relative had told her that she could leave foster care

sooner if she told someone she had been sexually abused.

Concerning Y.K., a doctor testified that Y.K. told him that Key had sexually abused her for a number of years and impregnated her two times. Y.K. herself testified, however, that although she had previously told police that Key had molested her, she had fabricated the story. Two other witnesses noted that Y.K.'s story changed on multiple occasions, including some recantations and reassertions.

A few witnesses testified on Key's behalf. His wife at the time of trial testified that she had never witnessed Key physically abuse any children, and that the complainant had never informed her of any abuse. Two Children's Protective Services employees testified that when they were sent to investigate allegations against Key of physical abuse, no family member had reported any sexual abuse. Finally, a friend of Key and his wife testified that she saw the complainant in the Key household during the relevant period, and that the complainant seemed normal and happy with both her parents.

On October 27, 2006, a Michigan state jury found Key guilty as charged of two counts of criminal sexual conduct in the first degree. On January 11, 2007, the trial court sentenced Key as a habitual offender to two concurrent terms of fifteen to forty years in prison. Key filed a motion for a new trial on the grounds that the jury's verdict was against the weight of the evidence. The trial court denied Key's motion.

On direct appeal, Key argued, *inter alia*, that the trial court erred in admitting evidence of his purported sexual abuse of other children and that the prosecutor committed misconduct by making inappropriate comments in closing arguments and by introducing inflammatory evidence. The Michigan Court of Appeals affirmed his conviction, holding that the "other acts" evidence was properly admitted and that no prosecutorial misconduct had occurred. *Key*, 2008 WL 3009937. Key raised the same claims in an application for leave to appeal to the Michigan Supreme Court, which that court denied. *People v. Key*, 483 Mich. 1031, 765 N.W.2d 618 (2009).

In 2010, Key filed in the trial court a motion for relief from judgment, raising claims about the bad-acts evidence, prosecutorial misconduct, ineffective assistance of appellate counsel, and the failure to draw an impartial jury from a fair cross-section of the community. The trial court denied the motion. Both the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal the trial court's decision. *People v. Key*, 490 Mich. 872, 803 N.W.2d 322 (2011).

In 2011, Key filed a federal petition for habeas corpus, raising the same claims he had presented to the state courts. The district court denied the writ on all grounds. The court did, however, grant a certificate of appealability solely on Key's prosecutorial-misconduct claim. That claim is before us on Key's timely appeal.

## II.

On appeal of a federal habeas corpus proceeding, we review de novo a district court's conclusions of law and conclusions on mixed questions of law and fact, and we review its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir.1999). Although we review de novo the district court's determination, when a state court adjudicated on the merits a claim now before us on habeas review, we accord *that* determination deference under the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir.2007).

Under AEDPA, a district court may not grant a habeas petition with respect to any claim that was adjudicated on the merits in state court unless it was based on unreasonable findings of fact or the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1), (2). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law, or if the state court decides a case differently than the [ ] Court on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the petitioner's case." *Id.* at 413, 120 S.Ct. 1495. To obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). This standard, the Supreme Court recently reminded us, is "difficult to meet." *White v. Woodall*, —— U.S. ——, 134 S.Ct. 1697, 1702, 188 L.Ed.2d 698 (2014) (internal quotation marks omitted).

### III.

As a preliminary matter, Key argues that we should eschew AEDPA deference and review this claim de novo because "[t]he last reasoned opinion of the state courts on the critical points here, the opinion of the Kent County Circuit Court on postconviction review, failed to assess this as a federal constitutional claim under the due process clause." It is true that where the relevant state court "did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply." *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir.2003). Here, however, the state court did assess the merits of the claim.

Because the last reasoned opinion of the state courts was the opinion of the Michigan Court of Appeals on direct review, not postconviction review, it is unclear exactly what Key is arguing. To the extent that he is indeed focusing on the Michigan Court of Appeals' summary denial on postconviction review and contending that that summary denial failed to review the claim, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). Thus, it is immaterial that the Michigan Court of Appeals on postconviction review summarily denied the prosecutorial-misconduct claim. Because there had been a reasoned judgment by the Court of Appeals on direct review, any subsequent summary orders adopted the reasoning of that merits determination.

■ Key's more likely argument is that the circuit court's decision did not assess the prosecutorial-misconduct claim as a federal constitutional claim because it relied solely on Michigan state cases. This exact argument, however, was rejected by the Supreme Court in *Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). In that case, the Ninth Circuit had observed that the state court "failed to cite

... any federal law, much less the controlling Supreme Court precedents." *Id.* at 8, 123 S.Ct. 362 (internal quotation marks omitted). The Supreme Court criticized the Ninth Circuit, noting that if this language "meant to suggest that such citation was required, it was in error." *Id.* Avoiding the pitfalls of § 2254 "does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [those] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.* Thus, as long as the last reasoned opinion of the state court—the Michigan Court of Appeals' decision on direct appeal—does not contradict clearly established federal law, habeas relief is inappropriate. The circuit court's failure to cite to any federal cases when assessing the prosecutorial-misconduct claim does not trigger de novo review of the claim. Instead, we apply AEDPA deference.

**IV.**

As Key's only claim in this appeal is premised on prosecutorial misconduct, he must show that the Michigan Court of Appeals' decision on direct review was an unreasonable application of *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). *Darden* held that the relevant question in a prosecutorial-misconduct case is "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181, 106 S.Ct. 2464. (internal quotation marks omitted). "[T]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because constitutional line drawing in prosecutorial misconduct cases is necessarily imprecise." *Slagle v. Bagley,* 457 F.3d 501, 516 (6th Cir.2006) (internal quotation marks and alterations omitted). Indeed,

because "the *Darden* standard is a very general one," courts have "more leeway ... in reaching outcomes in case-by-case determinations." *Parker,* —— U.S. ——, 132 S.Ct. 2148, 2155, 183 L.Ed.2d 32 (2012) (internal quotation marks omitted).

**A.**

■ Key groups his claims into three categories. In the first category, Key argues that the prosecutor improperly used testimony about A.K. and Y.K. in an attempt to mislead the jury. He criticizes the prosecutor for "purposely introduc[ing] a plethora of evidence unrelated to the case at hand in an attempt to denigrate [ ] Key's character and confuse the jury." This strategy, according to Key, created "substantial prejudice when improper propensity or 'bad man' evidence [was] argued to the jury." The Michigan Court of Appeals ruled that this category of claims did not involve prosecutorial misconduct because the prosecutor "did not interject inflammatory evidence or arguments into the case merely to evoke prejudice"; rather, "the evidence of defendant's uncharged sexual offenses [was] admissible pursuant to" the Michigan Rules of Evidence. *Key,* 2008 WL 3009937 at *5.

The Michigan Court of Appeals' determination was not unreasonable. Although he phrases it as a prosecutorial-misconduct claim, Key "has offered nothing more than his disagreement with the [Michigan court's] ruling that the 'other acts' evidence was properly admitted." *Bey v. Bagley,* 500 F.3d 514, 523 (6th Cir.2007). This personal disagreement "is not cognizable on federal habeas review, inasmuch as it involves no constitutional dimension." *Id.* Indeed, a prosecutor "may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings." *Cristini v.*

*McKee*, 526 F.3d 888, 900 (6th Cir.2008). This is true regardless of "whether or not the ruling itself was correct." *Frazier v. Huffman*, 343 F.3d 780, 792 (6th Cir.2003).

The trial judge allowed the prosecution to introduce evidence about Y.K. and A.K. Key challenged that ruling, but it was upheld on appeal by the Michigan Court of Appeals. Even if the Court of Appeals had found the evidentiary ruling improper, however, the prosecutor would not have committed misconduct by relying on that ruling. At bottom, Key is contending that the judge's ruling was in error, but he cannot challenge this evidentiary ruling through federal habeas corpus. *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). It certainly does not violate clearly established federal law for a prosecutor to rely on evidentiary rulings made by the trial court.

### B.

Key's second category of claims deals with "improper comments and other acts of misconduct" throughout the prosecution's case in chief, including that the prosecutor "improperly elicited hearsay statements, posed questions in a way that allowed her to testify to the jury, and interrogated witnesses in an attempt to present [Key] in an immoral light." With regard to the hearsay claims, the Michigan Court of Appeals noted that Key was challenging two particular instances of the prosecution's refreshing of witnesses' recollections, but concluded that the "trial court appears to have sanctioned the method ultimately used by the prosecu-

tor." *Key*, 2008 WL 3009937 at *4. Because the trial court sanctioned the prosecutor's approach, Key is challenging a mere evidentiary issue. "[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir.1983). Key has not shown any reason why this presumption would be overcome in his case.

■ As for posing questions in a testimonial manner, the Michigan Court of Appeals noted that "while the prosecutor made two 'testimonial' statements in this very lengthy trial, during the heat of cross-examining a difficult witness, both instances were met with objections and cured on the record." *Key*, 2008 WL 3009937 at *5. The court's determination that these two statements did not constitute misconduct is not unreasonable for two reasons. First and foremost, the judge gave a curative instruction after each statement, and "juries are presumed to follow the court's instructions." *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841, 129 S.Ct. 2139, 173 L.Ed.2d 1184 (2009); *see also United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir.2005) (noting that a court's "attentiveness and swift corrective action" by giving a curative instruction "prevented the prosecutors' improper comments from materially affecting the verdict"). Second, Key points to only two comments during a sixteen-day trial. On habeas review, "[r]eversal is required only if the prosecutor's misconduct is so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Lundgren v. Mitchell*, 440 F.3d 754, 778 (6th Cir.2006) (internal quotation marks omitted). It was not unreasonable for the Michigan Court of Appeals to determine that two isolated comments that

were cured on the record did not rise to the level of prosecutorial misconduct.

■ Finally, Key's claim that the prosecutor elicited hearsay to portray Key in an immoral light through questioning about Y.K. and A.K. is again a challenge to the evidentiary ruling allowing testimony about these two young women. Even if the evidence were inadmissible—which goes against the trial court's ruling, a ruling that we cannot review on federal habeas corpus—the prosecutor does not commit misconduct by asking questions that elicit inadmissible evidence. *See Wade v. White*, 120 F. App'x 591, 594 (6th Cir. 2005). Thus, no matter how we view the claim, the Michigan Court of Appeals was not unreasonable in its determination that the comments made during the trial did not amount to prosecutorial misconduct.

### C.

Key's final category of statements features seven different comments made during the closing argument that he believes rise to the prejudicial level required by *Darden*. Key simply misinterprets the first comment. He believes that the prosecutor insinuated that defense counsel botched the case when the prosecutor stated:

> In the beginning I told you what I was going to prove, but in the beginning you didn't hear anything about [Y.K.] other than [Y.K.] had reported and that that was the reason why [the complainant] delayed her reporting. We weren't going to go into that, but that became relevant after the opening. And so, now I will give you the complete picture of what happened in this case.

This statement merely references the fact that the trial judge initially did not allow testimony about Y.K., but during the trial he allowed the prosecution to pursue that line of inquiry because it had been opened by the defense. The statement implies nothing about defense counsel.

■ The second comment concerns the prosecutor's declaring that a witness was not telling the truth:

> So [A.K.] tells us in this courtroom that the reason she was naked from the waist down in someone else's apartment, in the bedroom, with her father, was because she needed to check for a vaginal infection, she needed to look at something? If the men don't know, the women certainly do, that looking inside means nothing and does nothing for a vaginal infection. She is not telling us the truth. That's plain and simple. And even if you wanted to believe that somehow, getting at the right angle, you could actually see inside your vaginal canal, you do not need to move from place to place on the sheets to get a better angle. That is ludicrous. She's not telling you the truth, she's doing the best she can to help her father, but she is not telling you the truth.

Counsel "must refrain from interjecting personal beliefs into the presentation of his case." *United States v. Young*, 470 U.S. 1, 8–9, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). That being said, we have held that labelling witnesses as liars does not "create an impression that the prosecutor knew of evidence not presented to the jury" if the prosecutor "argued from the evidence to contend that each person's testimony should not be believed." *Cristini*, 526 F.3d at 902. These labels are acceptable so long as "the prosecution's argument was coupled with a detailed analysis of the record" such that "[e]ach time the prosecutor said some witness had lied, he explained why the jury should come to that conclusion." *Id.* (emphasis omitted). Here, the prosecutor argued that A.K. was lying based on an analysis of the record,

inviting jury members to use their common sense to come to the conclusion that A.K. was not telling the truth.

 The third comment concerned a smokescreen analogy:

Ladies and gentlemen, a defense sometimes has teeth in it, it sometimes has something good to it, some meat to it. You know, a bear has claws and a lion has teeth; sometimes a defense has something to it. But when you don't have a defense, it's like an octopus; you kick up a bunch of dirt and put up a smokescreen and try to slink away in the confusion.

We agree with our sister circuit, which found acceptable a situation in which the prosecutor "had argued that [the defendant's] mitigation evidence was a smoke screen, similar to an octopus's beclouding the surrounding water." *Sinisterra v. United States,* 600 F.3d 900, 909 (8th Cir. 2010). The Eighth Circuit held that the prosecutor's "smoke screen/octopus argument was just that: the prosecutor's characterization of [the defendant's] evidence." *Id.* "[I]t is unrealistic to suggest that such empty clichés seriously affected the jury's deliberations." *Id.* (internal quotation marks omitted). Further, we have found acceptable similar comments. *See United States v. Wilson,* 199 Fed.Appx. 495, 498 n. 1 (6th Cir.2006) (finding acceptable comments about the "Empty Chair Defense" and the "Smoke and Mirrors Defense").

The fourth comment was directed at defense counsel:

[Defense counsel] again, knowing that I am the person who handles the child cases, tries to make that appear sinister. That's my job. It's not to railroad people. We have better things to do here. This case isn't about egos, it's about [the complainant]. And [defense counsel has] done everything to make sure you forget that.

"A prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth." *United States v. August,* 984 F.2d 705, 715 (6th Cir.1992). Indeed, such comments are usually not improper because the prosecution "necessarily has wide latitude during closing argument to respond to the defense's strategies, evidence and arguments." *Bedford v. Collins,* 567 F.3d 225, 233 (6th Cir.2009). Here, this solitary comment was in response to an implication put forward by defense during closing argument. Even *Darden* contemplates this sort of argument. *See Darden,* 477 U.S. at 182, 106 S.Ct. 2464 (finding significant that the objectionable content "was invited by or was responsive to the opening summation of the defense").

 The fifth and sixth comments both concern the prosecutor's implying that defense counsel withheld evidence. In the fifth comment, the prosecutor stated: "And every time we got up with the reports and said, 'Where is it?' [defense counsel] doesn't want the reports in. All the reports, mark this—the files are marked as evidence, but he doesn't want those in." In the sixth comment, the prosecutor stated:

[Defense counsel] then asks where are the copies of this journal? . . . You'll recall Ron Gates testified that [defense counsel] advised him about the letter and that . . . a copy of the journal [ ] was provided to [defense counsel], not the original. So when he asks you, "Where is the journal?" the question is best asked of him.

Defense counsel objected to both statements. Both times, the trial judge noted that these statements were merely "argument" and reminded defense counsel that the court had instructed the jury about the

role of closing arguments. Indeed, the trial court instructed the jury both before opening statements and after closing arguments that the statements by the lawyers were not evidence. "[A]rguments of counsel generally carry less weight with a jury than do instructions from the court." *Boyde v. California*, 494 U.S. 370, 384, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). This is so because arguments of counsel are "usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as statements of advocates" whereas jury instructions "are viewed as definitive and binding statements of the law." *Id.* (citation omitted). "We presume that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *United States v. Olano*, 507 U.S. 725, 740, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (internal quotation marks and alterations omitted). Indeed, *Darden* itself contemplated that jury instructions could cure potential misconduct. *See Darden*, 477 U.S. at 182, 106 S.Ct. 2464 (finding significant that the trial court "instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence").

■ The seventh and final comment relates to a misstatement of the evidence. Earlier in the trial, the prosecutor had asked one of Key's character witnesses, "You weren't aware that [Key] put someone in a coma, he was convicted of that recently?" to which the witness replied simply, "No." During rebuttal, however, the prosecutor stated:

And I do note that, when they did put on a defense, however, the one character witness they could find for his behalf is really a statement in itself. If the best character evidence you have to support your good character is your real estate agent from three years ago who doesn't even know that you were convicted of beating a man into a coma during the time you knew him—

Defense counsel objected immediately, and the trial court responded, "That's improper, and the jury is to disregard that." "[J]uries are presumed to follow the court's instructions," *CSX Transp.*, 556 U.S. at 841, 129 S.Ct. 2139, and the giving of a "strong, prompt curative instruction" factors into "our determination that [an] isolated statement made by the prosecutor did not cause petitioner's trial to be fundamentally unfair," *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1356 (6th Cir.1993). Indeed, improper comments can be "sufficiently remedied by the trial court's curative instruction along with the preliminary and final instructions given to the jury." *Shaieb v. Burghuis*, 499 Fed.Appx. 486, 499 (6th Cir.2012).

The Michigan Court of Appeals rejected Key's contention that comments during closing argument constituted prosecutorial misconduct. *See Key*, 2008 WL 3009937 at \*6–\*7. This determination was not unreasonable. As noted above, we held have comments similar to these not to be improper or as having been cured by instructions from the trial court. This is relevant because Key has the unenviable task of showing that the Michigan Court of Appeals' adjudication on this claim was an error "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S at 103, 131 S.Ct. 770. Our previous determinations convince us that the Court of Appeals' determination in this case was not unreasonable. This is especially true considering that Key must show that that determination was an unreasonable application of *Darden*, which is already a "very general" standard that gives courts substantial "leeway." *Parker*, 132 S.Ct. at

2155. He must do this by citing to Supreme Court precedent showing that habeas relief would be appropriate under these facts. *See id.* at 2154. He has not done so. Indeed, *"Darden* itself held that a closing argument considerably more inflammatory than the one at issue [in *Parker* ] did not warrant habeas relief." *Id.* at 2155 (noting that in *Darden* the prosecutor called the defendant an "animal" and noted his desire to see the defendant "with no face, blown away by a shotgun"). This case, like *Darden,* "was not perfect—few are—but neither was it fundamentally unfair." *Darden,* 477 U.S. at 183, 106 S.Ct. 2464. Because the Michigan Court of Appeals was not unreasonable in finding that these comments did not render Key's trial fundamentally unfair, Key is not entitled to habeas relief.

## V.

For the foregoing reasons, we affirm the district court's denial of habeas relief.