**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0527n.06
Filed: August 27, 2008

**No. 06-4563**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| BOBBY JOHNSON, JR., | ) | |
| | ) | ON APPEAL FROM THE |
| Petitioner-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| RICHARD HALL, Warden, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| _____ | ) | |

BEFORE: COLE and GRIFFIN, Circuit Judges; and SARGUS, District Judge.[*]

GRIFFIN, Circuit Judge.

Petitioner Bobby Johnson, Jr. appeals the district court's decision denying his Petition for a Writ of Habeas Corpus. Petitioner contends that he is entitled to the writ because he received ineffective assistance of counsel when his attorney disclosed to investigators the existence and location of inculpatory evidence. For the reasons set forth below, we affirm the district court's denial of Johnson's petition for a writ.

I.

In its opinion, the Ohio Court of Appeals thoroughly summarized the facts. In accordance with the standard of review set forth in the Antiterrorism and Effective Death Penalty Act

_____

[*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

("AEDPA"), discussed more fully below, we afford these factual findings deference. *See* 28 U.S.C.

§ 2254(d) & (e)(1). The Ohio Court of Appeals explained the background facts as follows:

> Surenda Ramjit shot Clifford Beller three times in the back of the head. The State of Ohio also charged Bobby Johnson with the murder. Johnson associated with a group of young people who lived in the area of Bedford, Northfield and Macedonia, Ohio, including co-defendant Ramjit. Johnson eventually became involved in a rap group that consisted of some friends and family members, including his cousin, Laquan Stowers. The members of the group occasionally funded their enterprise by selling marijuana. Stowers was entrusted with the proceeds of the sales; however, sometime in the later part of 1998, Stowers used a portion of the group's money to have his automobile repaired. This caused a rift between the cousins, and their various friends were forced to choose sides in the dispute. Ramjit remained loyal to Johnson; Beller became more closely associated with Stowers.
>
> On the evening of January 12, 1999, Stowers and his friends visited the home of Mary Ellen MacGregor, one of the female members of their clique. Her house was located across the street from Johnson's home. Beller, one of the few in the group who had the use of a vehicle, brought with him Stowers and two other friends, Clarence Harris and Michael Knapp. Sometime thereafter, Beller's best friend, Sean Alvis, arrived.
>
> At some point during that evening, the group wanted to smoke marijuana, so Knapp volunteered to go across the street to ask Johnson to sell him marijuana. Upon his arrival at Johnson's residence, Knapp observed Ramjit also was there. Johnson refused to sell him any marijuana because he was aware Knapp associated with Stowers. Knapp still was engaged in his effort when Harris arrived at Johnson's door to buy a "blunt." Harris was Stowers' closest ally; thus, his audacity at taking this action angered both Johnson and Ramjit. Ramjit shouted at him, ordering him off of Johnson's property.
>
> Ramjit's belligerence sparked Harris's anger as well as his retreat. When he and Knapp returned to MacGregor's garage where the group had gathered, Harris informed Stowers of the reception he had received and told Stowers he wanted to fight Ramjit. They all discussed the matter for a time, then noticed Johnson and Ramjit emerge from the house.
>
> As the two approached Johnson's Cadillac, parked on the street, Harris "ran outside and started arguing" with Ramjit and Johnson. Stowers and the other members of his

clique, including Beller, followed. Harris removed his shirt in preparation for a fight with Ramjit. Ramjit, however, refused to engage with the larger and more powerful Harris. Instead, he stared at Stowers while Harris insulted him and Johnson.

Johnson and Ramjit eventually left in Johnson's Cadillac and afterwards, Stowers' group continued with their party for a time. Beller then provided a ride home to most of the young men. After Beller dropped Harris off, Beller and Sean Alvis proceeded to a restaurant where they applied for employment. Upon being informed they could start working the following day, they proceeded to Alvis's house to attend a birthday party. The two were there for approximately an hour when Johnson telephoned. Johnson spoke to Alvis only briefly before requesting Beller. Following the telephone conversation, Beller informed Alvis he had to leave to pick up some money that Ramjit owed him. Beller first drove Alvis to the apartment complex where he and Beller had been staying with friends, then drove away from there alone at approximately 11:00 p.m., turning his vehicle left onto Sagamore Road rather than using the more typical right turn, which led to Northfield Road.

At approximately 1:20 a.m. on January 13, 1999, Walton Hills Police Sergeant David Choba was on routine patrol westbound on Sagamore Road when he observed a vehicle parked in the Metroparks picnic area. The unlit vehicle was not parked in a normal parking space. In view of the hour and the extremely inclement weather, Choba decided to investigate. He engaged his cruiser's video camera before exiting.

As Choba approached the vehicle, he observed what appeared to be steam coming off the vehicle, leading him to believe it recently had arrived in the lot. He also noticed what appeared to be two bullet holes in the front windshield of the vehicle. Upon closer observation, he saw the driver of the vehicle, later identified as Clifford Beller, sitting back in his seat with his head slumped slightly to his right. Beller's head was bloody. At that point, Choba radioed for additional assistance and notified ranger headquarters of the occurrence of a possible homicide on Metroparks property.

Subsequent testimony indicated the parking area had been empty within the hour prior to the discovery of Beller's vehicle. Although investigation of the case quickly was assigned to Ranger Sergeant John Manzatt, the hazardous road conditions prevented Manzatt from arriving on the scene until approximately 2:30 a.m. While Choba waited, he took some photographs and performed some cursory investigation of the crime scene. Some tire tracks, footprints, and blood spots were found in the area of the vehicle and the parking lot. A check of the vehicle's license, moreover, provided the victim's name.

Thereafter, Manzatt took additional photographs, obtained samples of the blood spots and also located the murder weapon buried in the snow a short distance from Beller's vehicle. The subsequent autopsy of Beller's body indicated he had been shot with a .40 caliber semiautomatic handgun at least three times in the back of the head at close range.

Some of the bullets shot from the handgun had also struck the interior of Beller's vehicle; one was lodged in the steering wheel.

Forensic analysis of the body and the vehicle further indicated a significant amount of "blow back" of the victim's blood and brain matter had occurred during the shooting; thus, the perpetrator of the crime, who had been in the rear passenger seat, would have been marked with it. During the daytime hours of January 13, 1999, Manzatt began interviewing Beller's family and friends.

At approximately 11:30 a.m. that day, Ramjit telephoned a friend to request a ride home from Johnson's house. Johnson thereafter was observed cleaning both the exterior and the interior of his Cadillac, which he had placed inside the home's garage.

On January 14, 1999, Manzatt interviewed Johnson in connection with the murder. During that first interview, Johnson stated he and Ramjit had been at Slam Jams from 5:00 p.m. to 8:00 p.m. on the night of the shooting. After he left, Johnson said he stayed at home the rest of the night and that he left Ramjit at Slam Jams with his brother.

The next morning, Johnson's mother contacted Manzatt to arrange another interview with her son. During that interview, Johnson informed police the two left Slam Jams together and he dropped Ramjit off. Shortly thereafter, he went to a Clarkwood Gas Station in Oakwood Village and Ramjit and Beller pulled up and Ramjit told him to follow Beller to the park because he had to meet someone to pay Beller the money Ramjit owed him. He further stated when he pulled in the picnic area, his vehicle got stuck in the snow and Beller pushed him out. As he began to drive away, he heard several shots. Ramjit then entered the passenger side of his car and told him to drive away. Johnson drove to his house and stayed there all night. He stated he did not ask Ramjit any questions and Ramjit told him "if you say anything I'll kill you too."

The grand jury indicted Johnson, the driver, for aggravated murder with two firearm specifications and he retained an attorney to represent him. Johnson communicated to his attorney information about the shooting, and specifically, told him the location

of a pair of blue latex gloves, the existence of which had been unknown to the police. On January 26, 1999, Johnson's counsel relayed this information to Manzatt. Counsel informed Manzatt that Johnson had told him that as he and Ramjit were driving away from the parking lot, Ramjit threw a pair of blue latex gloves out the window of the car. As a result, Manzatt located the gloves on the side of the road near the crime scene. One of the gloves tested positive for the victim's blood. The gloves were found on the east side of the parking lot and the south side of the road, which would be the passenger's side of the vehicle if it had been traveling east.

Following a lengthy jury trial, Johnson was found guilty of aggravated murder and not guilty of either specification. The court sentenced him to a term of life imprisonment without the possibility of parole for 20 years.

State v. Johnson, No. 76999, 2001 WL 1684840, at *1-*4 (Ohio Ct. App. Dec. 20, 2001) (unpublished).

Johnson's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 filed in the United States District Court for the Northern District of Ohio raised four claims of error. His fourth claim, the issue before this court, is that he was denied the effective assistance of counsel when his attorney informed police of the location of a pair of gloves that contained the victim's blood.

On February 9, 2006, the Magistrate Judge entered a Report and Recommendation that recommended that Johnson's petition be dismissed on all grounds. Johnson filed an objection to the report on March 1, 2006. On September 21, 2006, the district court adopted the Report and Recommendation in its entirety, finding that Johnson's first, third, and fourth claims failed on the merits, and that his second claim was procedurally defaulted. The district court dismissed the petition for a writ and found no basis to issue a certificate of appealability. On July 27, 2007, we granted the application for a certificate of appealability on the ineffective assistance of counsel claim only.

II.

Petitioner contends that the district court erred in denying his claim for ineffective assistance of trial counsel. Specifically, petitioner asserts that counsel improperly informed the police of the location of rubber gloves that contained the blood of Clifford Beller, the murder victim.

A claim of ineffective assistance of counsel is governed by *Strickland v. Washington,* 466 U.S. 668 (1984). To establish ineffective assistance, petitioner must demonstrate that counsel's performance was objectively unreasonable and that he was prejudiced by counsel's action or inaction. *Wilson v. Parker*, 515 F.3d 682, 698 (6th Cir. 2008) (citing *Strickland*, 466 U.S. at 687-88). Further, "[j]udicial scrutiny of counsel's performance must be highly deferential . . . . Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689 (citation omitted).

The second *Strickland* prong, that of prejudice, requires petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Because both prongs must be satisfied to establish ineffective assistance, if petitioner cannot satisfy one prong, the other need not be considered. *Id*. at 697.

In an appeal of a § 2254 habeas action, we review the district court's legal conclusions de novo, but review the court's factual findings under a clearly erroneous standard. *Dyer v. Bowlen*,

- 6 -

465 F.3d 280, 283-84 (6th Cir. 2006) (citation omitted).  Under AEDPA, 28 U.S.C. § 2254(d), a

habeas petition concerning any claim that the state court adjudicated on the merits may only be

granted when the adjudication:

> "(1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established federal law as determined by the Supreme Court
> of the United States; or (2) resulted in a decision that was based upon an
> unreasonable determination of the facts in light of the evidence presented in the state
> court proceeding."

*Cristini v. McKee*, 526 F.3d 888, 897 (6th Cir. 2008) (quoting 28 U.S.C. § 2254(d)).  Under this

standard, factual determinations made by the state court are presumed to be correct, unless the

petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. §

2254(e)(1).  Mixed questions of law and fact, which are present in this appeal, are reviewed pursuant

to the "unreasonable application" prong of AEDPA.  *Harpster v. Ohio*, 128 F.3d 322, 327 (6th Cir.

1997) (citing 28 U.S.C. § 2254(d)(1)).

Under the "unreasonable application" prong of AEDPA, a court may grant the writ "if the

state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case."  *Miller v. Francis*, 269 F.3d

609, 614 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).  "Even if a federal

court could determine that a state court incorrectly applied federal law, the court still could not grant

relief unless it also finds that the state court ruling was unreasonable."  *Cristini*, 526 F.3d at 897

(citing *Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000)).

Petitioner argues that the state court decision is not entitled to AEDPA deferential review because the state court of appeals ignored his primary allegation of a Sixth Amendment violation. Johnson contends that the state appellate court "sidestepped the primary issue, which was that had counsel not informed Sgt. Manzatt about the existence and location of the gloves, the state would have never learned about them" and instead only addressed the secondary issue of "the manner in which the gloves were introduced into evidence." In other words, Johnson asserts that because the state court did not address the present habeas claim on its merits, its findings are not entitled to AEDPA deference. *See Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).

The record contradicts petitioner's assertion. Although the state appellate court acknowledged that a stipulation was read to the jury informing it "that defense counsel had learned from his client the whereabouts of the evidence and had communicated that information to the police[,]" the court ultimately held that Johnson was not prejudiced by his attorney's revelation. Indeed, the court stated: "we conclude Johnson failed to prove that but for counsel's error the results of the trial would have been different." As the court concluded that Johnson failed to demonstrate prejudice, it was not necessary to address whether counsel's performance was objectively unreasonable, as failure to satisfy either of the two *Strickland* prongs defeats an ineffective assistance of counsel claim. *See Strickland*, 468 U.S. at 697. We thus conclude that the state court addressed petitioner's primary argument and therefore is entitled to deference on review.

Under Ohio's complicity statute, "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . [a]id or abet another in committing the offense." OHIO

REV. CODE § 2923.03(A)(2). The requisite culpability for an accomplice to a crime mirrors the culpability required for the underlying offense. *State v. Rice*, 659 N.E.2d 826, 834 (Ohio Ct. App. 1995). The state was therefore required to prove, beyond a reasonable doubt, the elements of aggravated murder, namely, that petitioner acted "purposely, and with prior calculation and design [to] cause the death of another . . . ." OHIO REV. CODE § 2903.01(A). In determining whether an individual aids or abets a murder under Ohio law, a jury must be able to find that the accused (1) formed the specific intent to commit murder, and (2) aided another in the commission of the charged offenses. *State v. Widner*, 431 N.E.2d 1025, 1027 (Ohio 1982).

Petitioner argues that the only concrete evidence that established his knowledge of Ramjit's intent to kill Beller was the bloody gloves, and that without counsel's disclosure of the existence and location of the gloves to investigators, the gloves would not have been discovered. Without his counsel's disclosure, Johnson contends that it could not be proved that he was an accomplice to aggravated murder. We disagree and conclude that the absence of the gloves would not result in "a reasonable probability that the jury would have reached a different verdict" given the strength of the remaining evidence.

We note at the outset that the second prong of the aiding and abetting inquiry is satisfied easily in the present case. The jury heard testimony that petitioner and Ramjit privately commiserated in the midst of a crowded club for approximately three hours on the night of the murder. This was interrupted only when Johnson made a phone call to the murder victim to set up

a late night meeting at an empty parking lot. Johnson then transported Ramjit to the murder scene. Johnson's actions therefore undoubtedly aided Ramjit in his murder of Beller.

Concerning the first prong, there is strong evidence, exclusive of the gloves, that Johnson specifically intended to murder Beller or aid in Beller's murder. The Magistrate's Report and Recommendation summarized this additional evidence:

> Johnson's phone call to set up the victim, that he drove out with the other killer, that he knew of the gun despite claiming not to have seen a gun that night, that he offered inconsistent stories as to his physical location at the time of the shooting, that the body was moved for additional shots to be fired, and that Johnson had hosted the other defendant at his home immediately after the killings [sic], when forensic evidence established that he would have been covered in blood, despite claiming to be afraid of him.

We likewise conclude that this additional evidence mitigated the harm caused by counsel's disclosure and that, given the strength of this evidence, there is no reasonable belief that the jury's decision would have been different had the gloves not been discovered.

Further, we also note that the Supreme Court of Ohio has observed that specific intent to commit aggravated murder can be inferred from efforts to avoid detection after the murder's commission. *See State v. Coleman*, 525 N.E.2d 792, 797 (Ohio 1988) (citing *State v. Austin*, 368 N.E.2d 59, 68-69 (Ohio Ct. App. Oct. 7, 1976)); *see also State v. Smith*, Nos. 16027, 16049, 1994 WL 263233, at *7 (Ohio Ct. App. June 15, 1994) (unpublished) (same); *State v. Fain*, No. 14578, 1990 WL 121116, at *1 (Ohio Ct. App. Aug. 22, 1990) (unpublished) (citing *State v. Eaton*, 249 N.E.2d 897, 906 (Ohio 1969)) (noting, generally, that "[f]light from justice, and its analogous conduct, have always been indicative of a consciousness of guilt.") (citation omitted), *vacated in part*

*and remanded*, 408 U.S. 935 (1972). Here, the evidence of concealment is substantial. Johnson provided Ramjit with a means of escape from the location of the murder. He further provided Ramjit with a place to stay, despite Johnson's testimony that he was afraid of Ramjit and despite medical testimony that Ramjit would have been covered in Beller's blood. Johnson also apparently aided Ramjit in the disposal of these bloody clothes, as there is credible testimony that Ramjit emerged from Johnson's house the next morning wearing clothing different from what he wore the night before. Lastly, investigators reported that Johnson had, initially, cleaned only the interior of his Cadillac and that the carpeting inside the vehicle was damp.

Similarly, although Johnson offered alternative explanations for his involvement, his contradictory statements provide ample reason for the jury to discredit his version of events. Johnson first denied that he was even at the murder scene, before finally admitting he was there. He initially stated that he left Ramjit at the club and went home alone. He later told investigators that he drove Ramjit home from the club, but that he met Beller and Ramjit, who were traveling together, at a gas station. He stated that Ramjit told him to follow Beller to the parking lot so that Ramjit could pay back the money owed to Beller. Lastly, despite pleading ignorance to whether Ramjit was armed, there was credible evidence that Johnson knew what type of gun Ramjit was carrying that evening.

Moreover, Johnson's statement to investigators that he immediately drove away after hearing gunshots contradicts the findings of the medical examiner that Beller's body was moved after the initial shot, so that it could be shot additional times. The fact that petitioner lied about this aspect

of the killing suggests that he waited for Ramjit to fire the additional shots so that he could provide an escape, that the slaying was not a surprise to Johnson, and that Johnson was therefore an accomplice.

Similarly probative is the meeting arranged by Johnson. Rather than simply dropping the money off to Beller, or having him pick it up, Johnson convinced Beller to travel alone to a secluded parking lot. Even though Johnson attempts to portray his inconsistent statements and his attempts to conceal evidence as behavior of an accessory after the fact, as opposed to an aider and abettor, such an assertion is without support in the record. The determination that Johnson intended that Ramjit shoot Beller was thus not unreasonable given this evidence.

Therefore, based on the quantity and strength of the additional evidence against Johnson, as well as on his obvious efforts to conceal his crime, which is probative of his intent, we conclude that petitioner has not satisfied his burden of demonstrating a reasonable probability that the result of his trial would have been different had his counsel not divulged the location of the bloody gloves. Petitioner is not entitled to relief pursuant to AEDPA.

III.

For the above reasons, we affirm the district court's denial of Johnson's Petition for a Writ of Habeas Corpus.