# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

————————————

## No. 201600208

————————————

### UNITED STATES OF AMERICA
Appellee

v.

### RAIDEN J. ANDREWS
Quartermaster Seaman Apprentice (E-2), U.S. Navy
Appellant

————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Commander Heather D. Partridge, JAGC, USN.
Convening Authority: Commander, Navy Region Mid-Atlantic,
Norfolk, VA.
Staff Judge Advocate's Recommendation: Captain Andrew R. House,
JAGC, USN.
For Appellant: Lieutenant Jacob E. Meusch, JAGC, USN.
For Appellee: Lieutenant James M. Belforti, JAGC, USN;
Lieutenant Robert J. Miller, JAGC, USN.

————————————

Decided 27 April 2017

————————————

Before GLASER-ALLEN, CAMPBELL, and HUTCHISON, *Appellate Military Judges*

————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

————————————

HUTCHISON, Judge:

In a mixed-plea general court-martial, a military judge convicted the appellant, pursuant to his pleas, of unauthorized absence, flight from apprehension, making a false official statement, wrongful use of marijuana, and larceny, in violation of Articles 86, 95, 107, 112a, and 121, Uniform Code

of Military Justice (UCMJ), 10 U.S.C. §§ 886, 895, 907, 912a, and 921. Contrary to his pleas, a panel of members convicted the appellant of sexual assault, in violation of Article 120, UCMJ, 10 U.S.C. § 920.[1] The members sentenced the appellant to 36 months' confinement, reduction to pay grade E-1, forfeiture of $1,616.00 pay per month for 36 months, and a dishonorable discharge. The convening authority approved forfeitures of only $1,566.90 pay per month for 36 months and the remainder of the sentence, as adjudged.

We address in detail three of the assignments of error (AOEs)[2] raised by the appellant: (1) factually insufficient evidence supports the sexual assault conviction; (2) the trial counsel (TC)[3] committed prosecutorial misconduct by repeatedly making objectionable arguments during closing arguments; and (3) exclusion of evidence of the appellant's intoxication deprived him of his constitutional right to present a defense. Having carefully considered the record of trial, the parties' submissions, and oral argument on the second AOE, we conclude the findings and sentence are correct in law and fact and find no error materially prejudicial to the appellant's substantial rights. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

On or about 10 May 2014, Petty Officer K invited the appellant, Petty Officer H, and Petty Officer G—all members of USS SAN JACINTO (CG 56)—to a party he and his wife, Ms. RW, hosted on a beach in Norfolk, Virginia.[4] Ms. AB, a friend of Ms. RW, also attended. That afternoon at the beach, the Navy members drank alcohol and Petty Officer K recalls the appellant asking about "hook[ing] up" with Ms. AB.[5] Petty Officer K replied this "wasn't a good idea," because Ms. AB previously had sex with Petty

---

[1] The members acquitted the appellant of two specifications of sexual assault, charged for exigencies of proof.

[2] In accordance with *United States v. McClour*, 76 M.J. 23 (C.A.A.F. 2017), we summarily reject the appellant's fourth AOE—that it was plain error for the military judge to instruct the members that "If, based on your consideration of the evidence, you are firmly convinced that the accused is guilty of the crime charged, you must find him guilty." *United States v. Clifton*, 35 M.J. 79 (C.M.A. 1992).

[3] Though the assistant trial counsel made most of the arguments which the appellant alleges as error, we attribute all prosecution arguments discussed in this opinion to the "trial counsel" as a collective term—to emphasize the supervisory and subordinate trial team members' shared responsibility to ensure that the prosecution collectively abides by the rules of professional responsibility and those established in case law.

[4] By the time of trial, Ms. RW and Petty Officer K had divorced.

[5] Record at 366.

Officer H.[6] The appellant claimed, however, in his statement to the Naval Criminal Investigative Service (NCIS) that Petty Officer K had also joked about the appellant "get[ting] lucky" with Ms. AB.[7] The party eventually moved to Petty Officer K's house, where Ms. AB arrived with a change of clothing so she could stay the night after the party.

Testimony diverged concerning what type of alcohol and how much Ms. AB drank at the party. Ms. AB told NCIS investigators that she consumed eight drinks over the course of the night. At trial, Ms. AB recalled consuming approximately 15 drinks, specifically "some Red[d's] Apple Ale in a bottle," Mike's Hard Lemonade, and beer.[8] Ms. RW and Petty Officer K also recalled Ms. AB making a cocktail consisting of "liquor and juice" called a "Pink Panty Dropper," and that she drank at least three of these cocktails.[9] However, Ms. AB never mentioned, at trial or to NCIS, that she ever drank any such cocktail.

Petty Officer J and his wife, Ms. SG, arrived at the party around 2100. They saw Ms. AB dancing with Petty Officers K and H, and hugging Petty Officers H and G. Others saw her kiss Petty Officer H. However, no one at the party testified to ever seeing Ms. AB dance with the appellant, or even talk to him at all. The appellant tried to talk to Ms. AB on three occasions, once asking her if she was going to finish her beer. Petty Officer K testified that Ms. AB was being "standoffish" towards the appellant.[10]

To Petty Officer J, Ms. AB "didn't seem . . . sober"—she was "slurring her speech," and was unbalanced, "swaying back and forth while trying to stand still."[11] Petty Officer J noted that as Ms. AB kept drinking, her level of intoxication "rose," and her "movements became more exaggerated[.]"[12] By the time Petty Officer J and Ms. SG left at midnight, Ms. AB was "[r]eally drunk"—she was "[s]louched on the couch, barely coherent[,]" and "[e]xtremely intoxicated."[13] Petty Officer J observed that Ms. AB was still talking to others at the party, but it would take her "10 to 15 seconds" to respond to a normal question.[14] Ms. SG noted that Ms. AB "tr[ied] to pass out

---

[6] *Id.*

[7] Prosecution Exhibit (PE) 5 at 1.

[8] Record at 410-11.

[9] *Id.* at 334, 367.

[10] *Id.* at 368.

[11] *Id.* at 311.

[12] *Id.* at 312.

[13] *Id.* at 312-13, 315.

[14] *Id.* at 314.

on the couch," and was "very not responsive to everyone else . . . trying to help her."[15] While the appellant was nearby on another couch in the living room, Ms. RW guided Ms. AB to the bathroom because Ms. AB was having difficulty walking, and was feeling "very numb" and "out of body," like she had "never felt before."[16]

Ms. RW then assisted Ms. AB to the spare bedroom. The appellant thought Ms. AB was drunk when he saw her going to the bedroom.[17] Ms. AB recalls "craw[ling] against the wall in order to get to the room" and leaning up to twist the door handle.[18] Ms. AB undressed, removing all her clothes except a tank top and bikini underwear. Ms. AB recalls plugging her iPhone into the wall, then getting into the bed and "passing out as soon as [her] head hit the pillow[.]"[19] When Ms. AB "seemed to be going to sleep," Ms. RW turned off the lights, shut the door, and went downstairs back to the party.[20]

After the party ended at approximately 0030, Ms. RW walked back to her room and saw the appellant trying to enter the spare bedroom, where Ms. AB had just gone to bed. Ms. RW told him "[n]o," and recalled the appellant protesting that he "just wanted to sleep in a bed."[21] Ms. RW reiterated, "[d]o not go in there . . . you are on the couch."[22] After the appellant got on the couch, covered up, and said he was going to sleep, Ms. RW went upstairs to her own bedroom.

Ms. AB's next memory was waking up "to a pressure on [her] hip bone area" and "upper thighs."[23] From the light outside the door, she realized that the appellant was on top of her. She "yelled . . . 'stop' three times" and "pushed him off[.]"[24] Ms. AB denied consenting to the appellant having sex with her, though she did not know whether the appellant actually penetrated her vulva with his penis.

---

[15] *Id.* at 323.

[16] *Id.* at 411-12.

[17] PE 4; Appellate Exhibit (AE) XXXIX at 24-25 ("[NCIS Agent]: Okay. And you remember seeing [Ms. AB] going back to the bedroom? [The appellant]: Yes. [NCIS Agent]: How was she? [The appellant]: Drunk.").

[18] Record at 412.

[19] *Id.* at 413.

[20] *Id.* at 337-38.

[21] *Id.* at 338.

[22] *Id.*

[23] *Id.* at 413.

[24] *Id.* at 414.

After pushing the appellant off of her, Ms. AB ran into the master bedroom, waking up Petty Officer K and Ms. RW. They both recall that Ms. AB was "really shaken up and crying," and that she said she had been assaulted by the "new guy."[25] Ms. RW recalled Ms. AB wearing the same clothing as when she went to bed (a tank top and bikini underwear), while Petty Officer K recalled Ms. AB not wearing any underwear (as did Ms. AB herself) when she ran into the room. Ms. AB then stumbled to the bathroom, where she threw up in the toilet before falling asleep in the master bathroom.

The appellant's account of the sexual encounter to NCIS is markedly different. He told NCIS agents that he walked into the guest bedroom and lay in the bed next to a fully-clothed Ms. AB for 15 minutes without kissing or touching her. The appellant recognized that Ms. AB was asleep. Then, Petty Officer K opened the door, looked into the room, and left. The appellant claims that he asked Ms. AB if they could have sex, to which she "said nothing at first," then "thru [sic] up," at which point he asked for sex again.[26] When she said "yes," the appellant responded, "awesome."[27] Ms. AB then took off her pants, and the appellant pulled his pants down. The appellant told NCIS that he "didn't care" about the fact Ms. AB had just vomited.[28] They had sex in the missionary position with no condom and without first kissing or engaging in any foreplay. The appellant claims Ms. AB moaned, put her arms around him, scratched his lower back, pulled his hair, and only then said "stop"—at which point he moved to the other side of the bed.

Petty Officer K corroborated the appellant's assertion that he was scratched by Ms. AB. He testified that he stopped the appellant as the appellant "bolt[ed] out of the guest bedroom"[29] and noticed fresh "vertical scratches" on the appellant's "mid to lower back."[30]

## A. Factual sufficiency of the evidence

We review questions of factual sufficiency *de novo.* Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

---

[25] *Id.* at 339, 370, 415.

[26] PE 4; AE XXXIX at 20; PE 5 at 1; Record at 507-08.

[27] PE 4; AE XXXIX at 35.

[28] PE 4; AE XXXIX at 20; PE 5 at 1.

[29] Record at 371.

[30] *Id.* at 371, 373, 397.

In order to find the appellant guilty, we must be convinced beyond reasonable doubt that the appellant "kn[ew], or reasonably should have known" that Ms. AB was "incapable of consenting"—that she "'lack[ed] the cognitive ability to appreciate the sexual conduct in question or the physical or mental ability to make [or] communicate a decision about whether [she] agreed to the conduct.'" *United States v. Solis*, 75 M.J. 759, 7634 (N-M. Ct. Crim. App. 2016) (quoting *United States v. Pease*, 74 M.J. 763, 770, *aff'd*, 75 M.J. 180 (C.A.A.F. 2016) (second alteration in original)), *aff'd*, __ M.J. __, 2017 CAAF LEXIS 98 (C.A.A.F. Feb. 13, 2017).

After reviewing the entire record, we are convinced of every element of sexual assault beyond a reasonable doubt and find that the appellant's sexual assault conviction is factually sufficient. Ms. AB's testimony was persuasive, and her level of intoxication was substantially documented by the other witnesses. The appellant himself corroborates Ms. AB's level of impairment, admitting to NCIS that Ms. AB was "drunk" when she went to bed and that she was possibly asleep or passed out before he had sex with her.[31]

The appellant avers that even if Ms. AB was incapable of consenting to the sexual act because of her impairment, he was reasonably mistaken as to that level of impairment. This argument, however, is unpersuasive. Any such belief was manifestly unreasonable given Ms. AB's lack of any meaningful interaction with him throughout the day and the appellant's admitted knowledge of Ms. AB's level of intoxication—as evidenced by the appellant's statements to NCIS that Ms. AB was "drunk" and that she vomited in the bed immediately preceding his having sex with her. These facts, coupled with Petty Officer K's testimony that he observed the appellant "bolting" out of the bedroom, all point to the appellant's subjective awareness that Ms. AB was incapable of consenting.

Consequently, we are convinced that, at the time of the sexual act, Ms. AB was incapable of consenting due to her impairment by alcohol—that is, she "'lack[ed] the cognitive ability to appreciate the sexual conduct,'" *id.*—and the appellant reasonably knew or should have known she was so impaired.

## B. Allegations of prosecutorial misconduct

### 1. Legal error

The appellant alleges that the TC committed prosecutorial misconduct during closing arguments, when, (1) he "repeatedly called [the appellant] a liar" and "made inflammatory arguments"; (2) "invented admissions" of guilt by the appellant; (3) accused the trial "defense counsel of not believing" the appellant; (4) "improperly placed the 'prestige' of the Government behind the

---

[31] PE 4; AE XXXIX at 25-26; PE 5 at 2.

credibility of [Ms. AB's] statements"; and (5) "misstated the law."[32] The civilian defense counsel did not contemporaneously object to any of the aforementioned arguments.

"Prosecutorial misconduct occurs when trial counsel overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *United States v. Hornback*, 73 M.J. 155, 159-60 (C.A.A.F. 2014) (citations and internal quotation marks omitted). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)).

"Improper argument is one facet of prosecutorial misconduct." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citing *United States v. Young*, 470 U.S. 1, 7-11 (1985)). Prosecutorial misconduct in the form of improper argument is a question of law we review *de novo. United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (citing *United States v. Marsh*, 70 M.J. 101, 106 (C.A.A.F. 2011)). In determining whether an argument is improper, we consider whether "[t]he improper comments in this case were" or "were not isolated" incidents. *United States v. Carter*, 61 M.J. 30, 34 (C.A.A.F. 2005). Indeed, "the argument by a trial counsel must be viewed within the context of the entire court-martial," and as a result, "our inquiry should not be on words in isolation, but on the argument as 'viewed in context.'" *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (quoting *Young*, 470 U.S. at 16) (additional citation omitted).

When a proper objection to a comment is made at trial, we review for prejudicial error. *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citing Art. 59, UCMJ). When there is no objection, however, the trial defense counsel forfeits the issue, and we review for plain error. *United States v. Pabelona*, 76 M.J. 9, 11 (C.A.A.F. 2017) (citing *United States v. Rodriguez*, 60 M.J. 87, 88 (C.A.A.F. 2004)). To show plain error, the appellant must persuade this court that: "'(1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused.'" *United States v. Tunstall*, 72 M.J. 191, 193-94 (C.A.A.F. 2013) (quoting *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011)). The plain error doctrine is "to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Causey*, 37 M.J. 308, 311 (C.M.A. 1993) (citations and internal quotation marks omitted).

---

[32] Appellant's Brief of 5 Dec 2016 at 27, 32 (internal citation omitted).

Here, we find plain or obvious error in some, but not all, of the challenged aspects of TC's argument, and that the error did not materially prejudice a substantial right of the appellant.

a. Calling the appellant a liar and inflammatory arguments

It is a basic rule of our profession that a "prosecutor should not make arguments calculated to appeal to improper prejudices of the trier of fact. The prosecutor should make only those arguments that are consistent with the trier's duty to decide the case on the evidence, and should not seek to divert the trier from that duty." ABA CRIMINAL JUSTICE STANDARDS FOR THE PROSECUTION FUNCTION 3-6.8(c) (4th ed. 2015) [hereinafter ABA].[33] Accordingly, the Court of Appeals for the Armed Forces (CAAF) has cautioned that "calling the accused a liar is a dangerous practice that should be avoided." *Fletcher*, 62 M.J. at 182 (citation and internal quotation marks omitted). TC are expected to "comment on . . . conflicting testimony" in closing argument without using "language that [i]s more of a personal attack on the defendant than a commentary on the evidence." *Id.*, at 183. *See also United States v. Knickerbocker*, 2 M.J. 128, 129-30 (C.M.A. 1977) (finding plain error in TC calling Knickerbocker's testimony "incredible," a "fairy tale," and expressing a personal opinion as to his guilt.)

However, TC are allowed to "'forcefully assert reasonable inferences from the evidence.'" *United States v. Coble*, No. 201600130, 2017 CCA LEXIS 113, at *10, unpublished op. (N-M. Ct. Crim. App. 23 Feb 2017) (quoting *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008)). There is an "exceedingly fine line which distinguishes permissible advocacy from improper excess" when it comes to commenting on the credibility of a defendant. *Fletcher*, 62 M.J. at 182-83 (finding TC's comments that Fletcher's testimony "was the first lie," that he "had 'zero credibility' and that his testimony was 'utterly unbelievable'" were "not so obviously improper as to merit relief in the absence of an objection from counsel"). Thus, "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory." *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987) (citing *United States v. Williams*, 529 F. Supp. 1085, 1106-07 (E.D.N.Y. 1981) ("'Lie' is an ugly word, but it is appropriate when it fairly describes the ugly conduct it denotes.").

Accordingly, one factor in considering whether the TC's forceful commentary on the appellant's credibility is improper is whether the

---

[33] *See* Judge Advocate General Instruction 5803.1E, Rule 3.8(e)(6) (20 Jan. 2015) ("To the extent consistent with these Rules, the ABA standards may be used to guide trial counsel in the prosecution of criminal cases.") (citations omitted).

appellant was charged with a false official statement.[34] Here, although the appellant pleaded guilty to a violation of Article 107, UCMJ, the members were not made aware of that fact until sentencing.

Another factor is whether the TC "explained why the jury should come to th[e] conclusion" that the appellant lacks credibility, *Cristini*, 526 F.3d at 902, or whether, instead, the TC's statements were "unsupported by any rational justification other than an assumption that [the appellant] was guilty," and "not coupled with a more detailed analysis of the evidence adduced at trial[.]" *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005). Such unsupported statements by the TC, devoid of any detailed analysis, are improper because they "convey an impression to the jury that they should simply trust the [government's] judgment" that the accused is guilty because the TC "knows something [the jury] do[es] not." *Id.*

In a closing argument that covered over 31 pages of transcribed text, the TC used the words "liar" and "lying" to describe the appellant, or stated the appellant told a "lie" or "lies", on 11 pages, some 25 times in total.[35] The TC also repeatedly referred to the appellant's NCIS statement as "fanciful,"[36] a "fake fantasy world,"[37] and "imaginary world."[38] At times, the TC's derogatory references regarding the appellant's veracity were supplemented with a "more detailed analysis of the evidence":[39]

> You remember [Petty Officer K's] statement in court. He said he specifically told [the appellant] not to pursue her. . . . Does it seem reasonable that [Petty Officer K] whose [sic] closer friends with [Petty Officer H], and that he's at his house would have this, this new 19-year-old kid come over and say hey you, why don't you go in and mess up the relationship? Yeah, go do

---

[34] *See, e.g. United States v. Doctor*, 21 C.M.R. 259, 259-60 (C.M.A. 1956) (finding no error where TC "called the accused a psychopathic liar and a schemer who would falsify to anyone" and referred to Doctor as a liar "some twenty times," because "[w]hen the making of a false official statement is the offense to be proven and there are facts to support the charge, trial counsel is within the limits of reasonable persuasion if he calls the defendant a liar").

[35] Record at 656-78, 712-19.

[36] *Id.* at 657, 665.

[37] *Id.* at 673.

[38] *Id.*

[39] *Hodge*, 426 F.3d at 378.

it you might get lucky. Does that make sense? It shouldn't because it's not true. He's lying[.]").[40]

However, often times, the opposite was true, and TC's derogatory comments were not tethered to a government theory of the case or supported by any "rational justification":

> Again, remember what reasonable doubt is. . . . It's not a 19-year-old Seamen apprentice who's a "Don Juan" type, who's able to coast [sic] consent out of passed out women lying in vomit-stained sheets. . . . So when he's telling you the story of his consent; it's *obviously and demonstrably a lie.*[41]
>
> . . . .
>
> Let's assume that world exists just for a second. I know it's an ingenious idea, but let's assume that's true, that [Ms. AB] actually said yes to the question of "Hey, do you want to have sex?". . . It is still a crime. Let me say that one more time, even if you buy *every lying word* out of his mouth. He is still a criminal.[42]

We conclude, therefore, that the sheer number of disparaging comments, often accompanied by no detailed analysis, violated the guidance of our superior court in *Fletcher* and *Knickerbocker* and constituted plain error. "[T]he [TC] should have avoided characterizing [the appellant] as a liar and confined h[is] comments instead to the plausibility of [the appellant's] story[.]" *Fletcher*, 62 M.J. at 183.

b. Invented admissions

A prosecutor "may strike hard blows" against a defendant, but is "not at liberty to strike foul ones." *Berger*, 295 U.S. at 88 (finding prosecutorial misconduct in part because the prosecutor "misstat[ed] the facts in his cross-examination of witnesses" by "putting into the mouths of such witnesses things which they had not said," and "assuming prejudicial facts not in evidence"). Accordingly, "[i]t is a fundamental tenet of the law that attorney[s] may not make material misstatements of fact in summation."[43]

---

[40] Record at 661.

[41] *Id.* at 665 (emphasis added).

[42] *Id.* at 668 (emphasis added).

[43] *See also* ABA, at 3-6.8(a) ("In closing argument to a jury . . . the prosecutor may argue all reasonable inferences from the evidence in the record, unless the prosecutor knows an inference to be false. . . . The prosecutor should not knowingly misstate the evidence in the record, or argue inferences that the prosecutor knows have no good-faith support in the record.").

*Davis v. Zant*, 36 F.3d 1538, 1548 n.15 (11th Cir. 1994) (citation omitted). Our court found error where a trial counsel, "either by design or through inexperience," mischaracterized a statement of regret by an appellant to an NCIS agent "as a crescendo to his argument, arguing the words in a manner that" inappropriately characterized them as "an admission to the underlying misconduct." *United States v. Fletcher*, No. NMCCA 201000421, 2011 CCA LEXIS 149, at *18-19, unpublished op. (N-M. Ct. Crim. App. 25 Aug 2011), *aff'd*, 71 M.J. 107 (C.A.A.F. 2012) (summary disposition).

"[W]hile counsel has the freedom at trial to argue reasonable inferences from the evidence, counsel cannot misstate evidence . . . ." *United States v. Carter*, 236 F.3d 777, 784-85 (6th Cir. 2001) (finding plain error where the prosecutor asserted a witness had been told the opposite of what she had testified to hearing) (citations omitted). Here, during the government's closing argument, the TC misstated portions of the appellant's responses from the NCIS interrogation: "[w]ell, *I thought* maybe she'll think I was [Petty Officer H]"—and, "*I thought she thought*—I assumed she thought I was [Petty Officer H]. It was a dark room and maybe she *would* get confused."[44] The TC further argued:

> [H]e admits, and in fact, he says that he was counting on the fact that *I hope that she will confuse me* with [Petty Officer H]. Maybe she'll think I'm [Petty Officer H]. He's counting on it, and that's evidence that she was impaired that he knew she was in [sic] impaired, and it[']s evidence in [and] of itself.[45]

The appellant objected, after TC's closing argument, that these attributions exposed the members to "improper argument" about "uncharged misconduct."[46] The appellee urges us to find that the appellant later "waive[d]" this issue by "withdr[awing] the request [for a curative instruction] in order to tactically avoid having the [m]ilitary [j]udge" issue an alternative instruction to the members which would "reemphasize the purposes for which the [m]embers *could* consider [the a]ppellant's explanation[.]"[47] "'A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *United States v. Elespuru*, 73 M.J. 326, 328 (C.A.A.F. 2014) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Consequently, we may "consider waiver only if an accused affirmatively, knowingly, and voluntarily relinquishes the issue at trial."

---

[44] Record at 663 (emphasis added).

[45] *Id.* at 675 (emphasis added).

[46] *Id.* at 680.

[47] Appellee's Brief of 3 Feb 2016 at 32, 33 (italics in original).

*United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001). Finally, "'[t]he determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding that case . . . .'" *Elespuru*, 73 M.J. at 328 (quoting *Johnson*, 304 U.S. at 464). We do not agree that the appellant did this with respect to the "improper argument" aspect of his objection, as the appellant renewed his objection after the military judge offered an alternative instruction.[48]

During his NCIS interrogation, the appellant discussed what may have gone into Ms. AB's decision to have sex with him based on his retrospective thoughts, including the information he learned after the encounter during the six months before he spoke with NCIS:

> NCIS Agent: Okay. So, what in the world would give you that impression that she would have you go in there and have sex with her?
>
> Appellant: The reason—well, my reasoning behind this is I assumed she thought I was [Petty Officer H].
>
> . . . .
>
> NCIS Agent: What possessed you to go into that room?
>
> Appellant: Stupidity I guess. I assumed I could make it up and get lucky once.
>
> NCIS Agent: Okay. Well, what it looks to me is you thought you could go in there and she would think you were [Petty Officer H]?
>
> Appellant: No.
>
> NCIS Agent: What makes you think it was [Petty Officer H], because you just told me you had no idea that they had a prior relationship?
>
> Appellant: I didn't, but afterwards I found out.[49]

---

[48] Record at 689-90 ("[Civilan Defense Counsel]: So our position is this is a situation created by the government in this particular case, and the curative instruction that we gave you is the only way out of it without a mistrial." "MJ: Very well . . . I think that the uncharged paragraphs that I have already in the instructions . . . to the elements of the offenses and . . . particularly with . . . respect to the accused's knowledge and [Ms. AB's] capability of consenting are sufficiently clear, *but your objection is certainly noted for the record.*"). (Emphasis added).

[49] PE 4; AE XXXIX at 15-16.

Despite the TC's claims, the appellant specifically told NCIS that at the time that he entered the bedroom, he did not intend for Ms. AB to confuse him for Petty Officer H:

> NCIS Agent: . . . . I 100 percent think you know—I know that you know what you were doing. You know that she would not know it was you and you know that you could take advantage of the situation because she was drunk. I know those things.
>
> Appellant: That's not what I was trying to do.[50]

Taken in the context of the entire interrogation, the appellant's statement that he "assumed she thought I was [Petty Officer H]," reflects the appellant's explanation—several months after the encounter—regarding why he *now believes* Ms. AB agreed to have had sex with him, not what his motivations might have been on the night in question.[51]

The appellee argues that TC's statements were still "reasonable inferences from evidence in the record . . . including that the [a]ppellant believed [Ms. AB] might confuse him with [Petty Officer H.]"[52] Indeed, other parts of TC's argument forcefully and persuasively made this point without misstating the evidence of record:

> What's the real reason he went in that room? We don't have to speculate. He told us. *"My reason behind this is I assumed she thought I was [Petty Officer H]" What does this show*? This shows that he knew she was unconscious in there, and if she became conscious, she would be so confused in the dark, so incompetent, so incapable of consenting, that her confusion will allow him to have sex. He's admitting to it. *Those are his words*. That's why he's going in there because she's so incompetent, so incapacitated, and so [a]sleep or unconscious she would think I was [Petty Officer H]. That should be startling to you. And that reveals who he is.[53]

However, the TC's attribution to the appellant of *statements* he never made—purportedly *admitting* that "he was *counting* on" and "*hop[ing]* that [Ms. AB] will confuse me" with Petty Officer H—are fundamentally different than simply arguing an inference of the appellant's intent from his actual

---

[50] PE 4; AE XXXIX at 27.

[51]  PE 4; AE XXXIX at 15.

[52] Appellee's Brief at 38.

[53] Record at 664 (emphasis added).

statements to NCIS.[54] Such claims inappropriately mischaracterize the appellant's statement to NCIS and take them out of the context in which they were made. We, therefore, conclude that the TC's erroneous claim, whether "by design or through inexperience," was plainly improper argument.

c. Accusing the trial defense counsel of not believing the appellant

Consistent with TC's aforementioned duty not to divert members from deciding cases based on the evidence, it is "plainly improper" argument to "encourage[]the members to decide the case based on the personal qualities of counsel rather than the facts." *Fletcher*, 62 M.J. at 182 (identifying plainly improper argument where, among other improper actions trial counsel "suggest[ed] that Fletcher's defense was invented by his counsel," and "called the defense case "that thing they tried to perpetrate on you").

Here, TC flatly stated that during his rebuttal argument, "[t]he defense doesn't believe their own client."[55] The appellee argues that the civilian defense counsel invited this response in his closing argument, when he claimed that the government did not believe their own witnesses.[56] Specifically, the defense counsel argued, "[the government] called witnesses to prove that their own witness, the victim in this case . . . is a liar"[57] and "they br[ought] in another witness to impeach their star witness[.]"[58]

However, the TC's actual statement is not at all responsive to the civilian defense counsel's arguments. An appropriate, "invited response" would be to comment on the consistencies in Ms. AB's statements and how, and to what extent, her version of events was corroborated by other witnesses—thereby rebutting the civilian defense counsel's argument that the government does not believe the victim—not to attack the civilian defense counsel, claiming that he does not believe his client, either. Moreover, the TC does not provide

---

[54] *Id.* at 675 (emphasis added). *See United States v. Dimberio*, 56 M.J. 20, 30 (C.A.A.F. 2001) (Sullivan, J., concurring in the result) ("Direct evidence of th[e] state of mind [of a witness] in the form of an admission by [the witness] was certainly stronger than the circumstantial showing of this same state of mind . . . .").

[55] Record at 713.

[56] *See United States v. Boyer*, No. NMCCA 201100523, 2012 CCA LEXIS 906, at *10-11, *22, unpublished op. (N-M Ct. Crim. App. 27 Dec 2012) (noting that "[w]hen determining whether prosecutorial comment was improper," under "'the 'invited response' or 'invited reply' doctrine, the prosecution is not prohibited from offering a comment that provides a fair response to claims made by the defense[,]'" quoting *Carter*, 61 M.J. at 33, and proceeding to consider remarks of the trial counsel "[d]isparag[ing] the opposing counsel").

[57] Record at 700.

[58] *Id.* at 707.

any rationale or reason why the defense "doesn't believe their own client." Rather, it is merely a bald assertion that would naturally cause the members to infer that civilian defense counsel was, by encouraging them to accept the appellant's narrative of events, knowingly lying to the members. Consequently, we conclude that such an assertion was plainly improper.

d. Improperly placing the prestige of the government behind the credibility of Ms. AB's statements

It is a universal rule of professional conduct that TC shall not offer closing arguments premised on "counsel's personal opinion," and TC "should not imply special or secret knowledge of the truth or of witness credibility,"[59] because "when the prosecutor conveys to the jurors his personal view that a witness spoke the truth, it may be difficult for them to ignore [that witness'] views[.]" *Fletcher*, 62 M.J. at 180-81 (citation and internal quotation marks omitted). "'[P]lac[ing] the prestige of the government behind a witness through personal assurances of the witness'[] veracity'" constitutes "improper vouching." *Id.* (quoting *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993)).

In *Fletcher*, the CAAF identified "the use of personal pronouns in connection with assertions that a witness was correct or to be believed[,]" as an example of improper vouching, and found plain error in the TC's comments that "*we know*" that drug test results were "consistent with recreational use", that it was "very apparent" the government's expert witness was "the best possible person in the whole country to come speak to us about this[,]" and, that the government's evidence was "unassailable, fabulous, and clear." *Id.* at 179-80. The *Fletcher* court highlighted these examples out of "more than two dozen instances in which the TC offered her personal commentary on the truth or falsity of the testimony and evidence." *Id.* at 181.

However, closing arguments "may properly include reasonable comment on the evidence in the case, including inferences to be drawn therefrom, in support of a party's theory of the case." RULES FOR COURTS-MARTIAL (R.C.M.) 919(b) (2012 ed.). Thus, it is not improper vouching for TC to "argu[e]," while "marshall[ing] evidence," that a witness "testified truthfully," particularly after the defense "'vigorously attack[s]'" this witness' "testimony during cross-examination." *United States v. Chisum*, 75 M.J. 943, 953 (A.F. Ct. Crim. App. 2016).

---

[59] ABA at 3-6.8(b).

Here, the TC commented that Ms. AB's testimony was "consistent the entire time."[60] The TC also asked the members:

> What other evidence do we have that we can be firmly convinced beyond a reasonable doubt that [Ms. AB] was asleep when this happened? Well, her testimony. Her testimony was, "I woke up. I went to bed and the next thing I know I feel pressure, and then I realize that it's this 'new guy' on top of me." And she woke up to Seaman Apprentice Andrews on top of her. That's her testimony. It's credible. It's uncontroverted, and you can believe it, and you can convict on that alone.[61]

We find that this is not impermissible vouching. The TC did not use any personal pronouns indicating personal opinion. Nor did the TC give the impression that this statement was based on evidence outside the record. After the civilian defense counsel vigorously attacked the credibility of Ms. AB on cross-examination, it was not improper argument for the TC to direct the members' attention to Ms. AB's testimony and argue that she was truthful. Even assuming *arguendo* that these comments by TC constituted impermissible vouching, these relatively isolated instances do not rise to the level of plain error.[62]

e. Misstating the law

Another type of improper prosecutorial argument is "erroneous exposition of the law." *United States v. Abernathy*, 24 C.M.R. 765, 774-75 (A.F.B.R. 1957) (ordering a rehearing in part because trial counsel committed plain error in erroneously arguing "that the accused could also be convicted" of "robbery solely by reason of his participation in [a] black-market venture" because the "facts were analogous to those in a felony murder situation");

---

[60] Record at 666.

[61] *Id*. at 672. The "you can convict on that alone" comment could also be viewed as a misstatement of the law defining sexual assault, given that Ms. AB did not know whether the appellant had actually penetrated her vulva with his penis. However, we decline to find this to be a plainly improper legal argument, given that it was at most an isolated misstatement of the law, and the military judge properly instructed the members as to the element of penetration, and the need to follow her instructions regardless of what counsel say. *Id.* at 640, 656. Moreover, the appellant admitted to "having sex in the missionary position" with Ms. AB, so there was no prejudice. PE 5 at 1.

[62] *See United States v. Solomon,* No. NMCCA 201100582, 2012 CCA LEXIS 291, at *17, unpublished op. (N-M. Ct. Crim. App. 31 Jul 2012), *rev'd on other grounds*, 72 M.J. 176 (C.A.A.F. 2013) (declining to find plain error in references by the TC "to [the] believability of his witnesses on four occasions in the course of a lengthy closing statement").

*United States v. Rodrigues*, No. 97-10113, 1998 U.S. App. LEXIS 36919, at *26, *31 (9th Cir. Mar. 15, 1999) (reversing Rodrigues's conviction for bribery in part because of the prosecutor's "misstatement of the law" of bribery in claiming that Rodrigues only had to 'receive[] benefits with criminal intent'" to be guilty).

Here, TC argued that the members should find that Ms. AB was not competent to consent to sex with the appellant by drawing analogies to the levels of impairment which would preclude someone from enlisting or accepting a commission in the Navy or having nose surgery:

> Now, in the terms of competency, let me frame it, so there is no mistake that we've proven this beyond a reasonable doubt. Think of a different context. Let's assume for an instant that somebody sharing these kinds of incompetency traits walks into a Navy recruiting office and we don't know what happens in there. But within a few minutes, somebody having these levels of incompetency runs out of there or just stumbles and cries and shakes and says, "I didn't want to enlist." Or "I didn't want to commission." And the Navy recruiter says, "Nope, nope, she actually did." Or going into a hospital with that level of intoxication[,] that level of low competency[,] walks into a hospital and that person has an otherwise fine nose and says that I want a neuroplasty. I want nose surgery. And on the operating board says, "What's happening to me?" and leaves and the surgeon is saying, "No, no, they really, really, wanted it." Would that make any sense? Would those people get in trouble?[63]

Analogies of this type are fraught with peril. In *United States v. Newlan,* No. 201400409, 2016 CCA LEXIS 540, at *5, unpublished op. (N-M Ct. Crim. App. 13 Sep 2016), we set aside Newlan's conviction for sexual assault of a woman allegedly "incapable of consenting due to alcohol impairment" in violation of Article 120(b), UCMJ, because the military judge defined "impaired" based on its Article 111, UCMJ, drunken operation of a motor vehicle, definition. We concluded that the military judged erred because as "a term of art applicable only to" Article 111, UCMJ, the use of its definition by the military judge *and trial counsel* "amplified the risk that members would confuse the distinction between *any impairment* and impairment which was sufficient to render [an alleged victim] incapable of consenting." *Id.* at *21, 28 (emphasis added).

---

[63] Record at 670-71.

While TC are able to use "matters of common public knowledge based on ordinary human experience" as examples in closing argument,[64] we find the TC's importation of the civil law concept of contractual capacity as analogous to the impairment required for a conviction under Article 120(b), UCMJ to be confusing, irrelevant, misleading, and plainly improper.

### 2. Prejudice to the appellant

Even though we "conclude that prosecutorial misconduct occurred," we are mindful that relief in the form of a rehearing "is merited only if that misconduct 'actually impacted on a substantial right of an accused (*i.e.,* resulted in prejudice).'" *Pabelona*, 76 M.J. at 12 (quoting *Fletcher*, 62 M.J. at 178). In assessing prejudice, we consider the cumulative impact of individual instances of prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial. *Fletcher*, 62 M.J. at 184. To determine whether the trial counsel's comments, taken as a whole, were "so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone," we consider: (1) the severity of the misconduct, (2) any curative measures taken, and (3) the strength of the Government's case. *Id.* It is possible for the third factor to "so overwhelmingly favor[] the government" so as to "establish [a] lack of prejudice" from improper argument, "in and of itself." *Pabelona*, 76 M.J. at 12.

### a. Severity of misconduct

> Indicators of severity include (1) the raw numbers—the instances of misconduct as compared to the overall length of the argument, (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations; and (5) whether the trial counsel abided by any rulings from the military judge.

*Fletcher*, 62 M.J. at 184 (citation omitted). We find that on balance, the misconduct was severe and permeated the initial findings' argument, but not the rebuttal. The trial on the merits lasted only three days and the members deliberated for only three hours before convicting the appellant. Although the members acquitted the appellant of two sexual assault specifications, those specifications were simply charged as alternate theories of proof arising from the same sexual encounter with Ms. AB. As a result, the appellant received no significant consideration from the panel in the form of an acquittal.

---

[64] ABA at 3-6.9.

18

b. Curative measures taken

This factor is evenly balanced. Although the military judge did not take any specific curative measures in response to TC's plainly improper arguments, she did properly instruct the members on the definition of "incapable of consenting,"[65] that "argument by counsel is not evidence and counsel are not witnesses,"[66] and to apply the law as she instructed. The military judge reiterated, "if there's a discrepancy between my instructions and what counsel have argued to you or how they have referred to those instructions, you must follow my instructions."[67] Moreover, it is "the duty of . . . [defense counsel] to ferret out improper argument, object thereto, and seek corrective action[.]" *United States v. Toro,* 37 M.J. 313, 318 (C.M.A. 1993) (citation and internal quotation marks omitted) (alteration in original). The appellant's civilian defense counsel did not object during TC's arguments and then only objected to one of TC's improper comments after the fact.[68] Finally, members are presumed to have complied with instructions absent evidence to the contrary, *United States v. Rushatz,* 31 M.J. 450, 456 (C.M.A. 1990), even in cases featuring improper prosecutorial argument.[69]

c. Strength of the government's case

The government's case was strong relative to the defense case. Even though Ms. AB's testimony regarding how much alcohol she consumed varied from her NCIS statement, everyone else at the party who testified described Ms. AB as being extremely intoxicated shortly before the appellant had sex with her—she was drunkenly stumbling, falling asleep on a couch, and unable to have a normal conversation with other partygoers. They noted the appellant was in the same room and would have been able to see this behavior of Ms. AB.

---

[65] Record at 641.

[66] *Id.* at 719.

[67] *Id.* In fact, the civilian defense counsel even pointed out the TC's erroneous analogies to enlisting in the military or getting plastic surgery: "[T]hey had the audacity to ask you to adopt the standard, which by the way, is clearly not the law that if somebody walks into a Navy recruiting office, you know, a drunk person can't consent to signing a contract[;] are you kidding me[?] . . . It's clearly not the law[.]" *Id.* at 709.

[68] *See supra* note 48.

[69] *See United States v. Tanksley,* 7 M.J. 573, 579 (A.C.M.R. 1979), *aff'd,* 10 M.J. 180 (C.M.A. 1980) (finding impermissible argument "adequately offset by the trial judge's instructions on findings to the effect that counsel's arguments are not evidence and the court members are not to give them any further credence or attach to them any more importance than the court members' own recollections of the evidence compel").

The appellant's own statements to NCIS further establish that Ms. AB had expressed absolutely no interest in him—sexual or otherwise—at any time before he entered the bedroom; that he believed Ms. AB to be drunk when she stumbled to the bedroom, shortly before he had sex with her; and that he saw Ms. AB vomit in the bed, but still decided to have sex with her.

Thus, while acknowledging that TC's misconduct was severe, and assuming *arguendo* that the curative measures taken by the military judge were inadequate, we are "confident that the members convicted the appellant" of having sex with Ms. AB, while he knew or reasonably should have known that she was incapable of consenting, "on the basis of the evidence alone." *Sewell,* 76 M.J. at *1415 ( citation and internal quotation marks omitted).

## C. Exclusion of evidence of the appellant's intoxication

The appellant next contends that the military judge' exclusion of evidence related to the appellant's level of intoxication deprived him of "'a meaningful opportunity to present a complete defense.'"[70] In denying the defense's request to introduce the evidence, the military judge provided:

> I will allow you to ask [RW] whether or not the [appellant] was consuming alcohol because I can foresee a myriad of relevant things that will come up that involve what people were doing? What people were observing? Where they were? And it has already come out. What I will not allow is any more detailed testimony as far as level of intoxication, and all the intoxication aspects that we are delving into regarding the alleged victim because the government is right at a certain point, it is not relevant and it is just creating the appearance that that is a defense when voluntary intoxication is not a defense.[71]

Consequently, the military judge only permitted trial defense counsel to ask RW whether the appellant consumed alcohol and who provided it to him.[72]

"'Whether rooted directly in the Due Process Clause . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment . . . the Constitution guarantees criminal defendants a meaningful opportunity to

---

[70] Appellant's Brief at 39 (quoting *United States v. Bess*, 75 M.J. 70, 75 (C.A.A.F. 2016)) (additional citations omitted).

[71] Record at 353-54.

[72] *Id.* at 356. ("I will permit the defense one question of (sic) if the accused consumed any alcohol, and one question as to the source of the alcohol, and then that would be it with this witness[.]").

present a complete defense.'" *United States v. Bess*, 75 M.J. 70, 74 (C.A.A.F. 2016) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). "'A defendant's Sixth Amendment right to confront the witnesses against him is violated where it is found that a trial judge has limited cross-examination in a manner that precludes an entire line of relevant inquiry.'" *Id.* at 75 (quoting *United States v. Israel*, 60 M.J. 485, 488 (C.A.A.F. 2005)).

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." MILITARY RULE OF EVIDENCE 401, SUPPLEMENT TO THE MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). We review a military judge's decision to admit or exclude evidence for an abuse of discretion.[73] *United States v. McCollum*, 58 M.J. 323, 335 (C.A.A.F. 2003). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003). "'The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)) (internal quotation marks omitted).

The appellant argues that evidence of the appellant's level of intoxication was relevant to show that he did not "have the situational awareness" necessary to carry out the criminal scheme assigned to him by the government—"that he knew [Ms. AB] was intoxicated, anticipated she would confuse him with [Petty Officer H], and took advantage of that situation to have sexual intercourse with her against her will."[74] The appellant's argument is misplaced and fails to recognize the required *mens rea* for offenses under Article 120(b)(3), UCMJ.

As a threshold matter, we note that "[v]oluntary intoxication, whether caused by alcohol or drugs, is not a defense." R.C.M. 916(l)(2).

> However, evidence of any degree of voluntary intoxication may be introduced for the purpose of raising a reasonable doubt as to the existence of actual knowledge, specific intent,

---

[73] Appellee argues that since the appellant did not object at trial on the specific ground he argues on appeal, we should review for plain error. Appellee's Brief at 51. We disagree. Trial defense counsel argued at trial that the appellant's level of intoxication was relevant to show whether or not the appellant was able to perceive Ms. AB kissing Petty Officer H and "a lot of other things also." Record at 352. As a result, we conclude trial defense counsel preserved this issue for appeal.

[74] Appellant's Brief at 43 (citation omitted).

willfulness, or a premeditated design to kill, if actual knowledge, specific intent, willfulness, or premeditated design to kill is an element of the offense.

*Id.*

Sexual assault under Article 120(b)(3), UCMJ, however, "require[s] only general intent, not specific intent." *United States v. Clugston*, No. 201500326, 2017 CCA LEXIS 43, at *24, unpublished op. (N-M. Ct. Crim. App. 31 Jan 2017). "The general intent requirement is satisfied by proof that a defendant committed a volitional act that he or she knew or reasonably should have known was wrongful." *United States v. McInnis*, 976 F.2d 1226, 1234 (9th Cir. 1992) (citation omitted). Because sexual assault under Article 120(b)(3) does not require proof of actual knowledge or specific intent, "appellant's voluntary intoxication is not legally relevant to whether he committed the offense."[75] *United States v. Lovett*, No. 20140580, 2016 CCA LEXIS 276, at *2 n.2, unpublished op. (A. Ct. Crim. App. 29 Apr 2016) (affirming sexual assault conviction under Article 120(b)(2), UCMJ, which contains the same *mens rea* requirement as Article 120(b)(3)).

Simply put, whether or not the appellant had the "situational awareness" to "know" Ms. AB was intoxicated, or to anticipate she might confuse him with someone else, is not conclusive. Article 120(b)(3) requires only that appellant reasonably should have known Ms. AB was incapable of consenting due to impairment by alcohol. Therefore, any evidence tending to show the appellant's actual, subjective lack of knowledge concerning Ms. AB's level of impairment and his actual, subjective intent in entering the bedroom are not facts of consequence. Accordingly, the military judge did not abuse her discretion when she found testimony about the appellant's level of alcohol consumption was not relevant.

Regardless, even assuming the military judge abused her discretion, we find any such error to be harmless. "A constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) (citations and internal quotation marks omitted). We review this question of law *de novo. United States v. Tearman*, 72 M.J. 54, 62 (C.A.A.F. 2013). Thus, the question before us is whether we can conclude beyond a reasonable doubt that the members would have reached the same verdict had the appellant been permitted to introduce evidence of his level of alcohol consumption.

---

[75] We note that the appellant was also charged in the alternative with, and acquitted of, sexual assault under Articles 120(b)(1) and 120(b)(2), both of which are also general intent crimes.

Here the appellant admitted to NCIS: (1) that he had no significant interaction with Ms. AB throughout the day; (2) that he thought Ms. AB was drunk when she went into the bedroom; (3) that she was asleep in the bed when he laid down next to her; and (4) that she vomited on the bed after he asked her if she wanted to have sex. Additionally, multiple witnesses testified that Ms. AB was intoxicated and had difficulty walking and carrying on a conversation. More than simply persuading us that the conviction is legally and factually sufficient, as we noted *supra*, these facts leave us convinced beyond a reasonable doubt that any error committed by the military judge in excluding evidence of the appellant's level of alcohol consumption was harmless and did not contribute to the guilty verdict.

## II. CONCLUSION

The findings and sentence, as approved by the CA, are affirmed.

Chief Judge GLASER-ALLEN and Senior Judge CAMPBELL concur.

For the Court

R.H. TROIDL
Clerk of Court